STATE OF NORTH CAROLINA v. JOHN EDWARD KUPLEN

No. 355A84

(Filed 6 May 1986)

1. **Constitutional Law § 46— refusal to appoint new counsel—no violation of constitutional rights**

    Defendant was not denied the effective assistance of counsel, due process and equal protection by the trial court's refusal to appoint new counsel when defendant requested that his court-appointed counsel, an assistant public defender, be discharged, where the evidence showed only that defendant was refusing to cooperate with his court-appointed counsel and had gone behind counsel's back to hire a detective to investigate the case and his counsel; defendant's evidence failed to support his contention that his counsel had breached his trust with another attorney; the trial court found that there was nothing to prohibit appointed counsel from providing effective assistance to defendant; after conducting the inquiry required by N.C.G.S. § 15A-1242, the trial court permitted defendant to waive assigned counsel and appointed the assistant public defender as standby counsel; and upon defendant's request, the court reinstated the assistant public defender as full-time counsel before the trial began.

2. **Constitutional Law § 68; Criminal Law § 91.7— subpoena not served—denial of motion for continuance—constitutional right to produce witnesses**

    The trial court's denial of defendant's motion for a continuance when his subpoena of a defense witness was not served because the witness had left the state did not violate defendant's right to compulsory process guaranteed by the Sixth Amendment to the U. S. Constitution or his right of confrontation guaranteed by Art. I, § 23 of the N. C. Constitution where defendant knew that the witness was reluctant to testify but issued a subpoena for her only four days before the trial, and where defense counsel admitted that the witness could not establish an alibi and the evidence offered on *voir dire* indicated that the testimony of the witness would not be of material aid to the defense but would show only how defendant appeared after the crimes supposedly happened.

3. **Bills of Discovery § 6— statements to fellow inmate—notice of substance—admissibility**

    Testimony by a fellow jail inmate concerning statements made to him by defendant was not inadmissible under N.C.G.S. § 15A-903, even if it is assumed that the legislature intended for the substance of a statement made by a defendant to a person other than a law officer to be divulged by the State without a motion by defendant, where notice of the substance of the statements "relevant to the subject matter of the case" was timely given to defendant, and where those portions of the testimony concerning defendant's statements about what would happen to snitches, to which objection was made and no notice was given, related only to an explanation of why the witness came forward with the evidence.

State v. Kuplen

**4. Criminal Law § 73.4— statements not hearsay**

Testimony concerning statements made by defendant about what would happen to snitches was not hearsay where the statements were made by defendant to the witness and not by defendant to someone else who related them to the witness. N.C.G.S. § 8C-1, Rule 801(d).

**5. Constitutional Law § 70— right of confrontation—witness represented by another member of Public Defender's office**

The constitutional right of confrontation of a defendant represented by an assistant public defender was not violated by the denial of his motion for a mistrial on the ground that a conflict of interest existed because a State's witness was represented for charges pending against him by another member of the public defender's staff and this conflict of interest limited defense counsel's ability to cross-examine the witness. Even if defendant's confrontation rights were violated, such error was harmless beyond a reasonable doubt since the testimony of the witness was not essential to the State's case; defense counsel in fact cross-examined the witness about whether he was to receive a benefit from the State because of his testimony, and no showing was made that the perceived conflict actually influenced the scope of cross-examination; and the State's evidence was clear, strong, consistent and overwhelming.

**6. Criminal Law § 66.16— photographic identification—no individual display—independent origin of in-court identification**

There was nothing in the record to support defendant's contention of a lone display of defendant's photograph to a rape and assault victim. Furthermore, the victim's in-court identification of defendant was of independent origin of any pretrial identification procedure where all the evidence showed that the only pretrial identification by the victim was a fairly conducted, multiple picture, photographic identification which was not impermissibly suggestive and that the victim knew defendant from previous contacts and spent some twenty minutes conversing with him in her apartment before he began to attack her.

**7. Criminal Law § 169.6— failure of record to show excluded evidence**

Defendant failed to show prejudice by the exclusion of testimony where the record failed to show what the witness's answer would have been to the question asked and thus how it was relevant.

**8. Criminal Law § 55; Constitutional Law § 76— defendant's failure to provide blood sample—relevancy—no violation of right against self-incrimination**

Testimony that defendant did not provide a sample of his blood was relevant to explain why no comparison of his blood with certain State's exhibits was performed. Furthermore, evidence that defendant did not provide a blood sample did not violate defendant's Fifth Amendment privilege against compulsory self-incrimination or his right under N.C.G.S. § 15A-279(d) against the use of statements made in the absence of counsel during nontestimonial identification procedures.

**9. Criminal Law § 127— motions to set aside verdict and arrest judgment—discretion of court**

Motions to set aside the verdict and to arrest judgment are addressed to the sound discretion of the trial judge, and in the absence of an abuse of discretion are not reviewable on appeal.

**10. Criminal Law § 112.4— refusal to instruct on circumstantial evidence**

The trial court properly refused to give a requested instruction on circumstantial evidence where the court gave a correct instruction on reasonable doubt.

**11. Criminal Law § 95.1— photographs and diagram—refusal to give limiting instruction**

The trial court did not err in refusing to give an instruction limiting the use of photographs and a diagram introduced by the State to illustrative purposes where many if not all of the photographs could properly have been considered by the jury as substantive evidence under N.C.G.S. § 8-97; it would have been necessary that defendant specifically identify those exhibits which he contended were subject only to illustrative use in order for the trial court to give a proper limiting instruction; and a general instruction on limited use of photographs and diagrams would have been incorrect and misleading.

**12. Rape and Allied Offenses § 6.1— first degree sexual offense—attempted first degree rape—failure to submit lesser offenses**

In a prosecution for first degree sexual offense and attempted first degree rape, there was no merit to defendant's contention that the trial court should have instructed on the lesser-included offenses of second degree sexual offense and attempted second degree rape because the jury could have found that any serious injury to the victim occurred after the attempted rape and sexual offense were complete since, even if N.C.G.S. § 14-27.1 and 14-27.2 were construed to require the infliction of personal injury concomitant with the rape or sexual offense, the trial judge did not allow the jury to consider the infliction of serious personal injury to enhance the crimes to first degree but instructed only on the element that "the defendant displayed a dangerous weapon," and the uncontradicted evidence showed that defendant displayed and used a knife prior to both offenses.

**13. Assault and Battery § 15.2; Rape and Allied Offenses § 6— peremptory instruction on knife as deadly weapon**

The trial court in a prosecution for first degree sexual offense, attempted first degree rape and felonious assault did not err in instructing the jury that a knife capable of cutting a person's throat, going into the windpipe and going four inches into the stomach was a deadly weapon.

**14. Assault and Battery § 15.3— peremptory instruction on serious injury**

The trial court's instruction that "an injury going into the windpipe in the throat, and four inches deep into the stomach, is a serious injury," if error, is not plain error since it would not have had a probable impact on the jury's finding of guilt.

State v. Kuplen

**15. Criminal Law § 138.7— sentencing hearing—defendant's prior conduct**

    The district attorney could properly question a witness at defendant's sentencing hearing about defendant's conduct on a previous occasion when he assaulted other people in the witness's presence and she prevented the victims from calling the police.

**16. Criminal Law § 138.21— serious injury as element of offense—especially heinous, atrocious or cruel aggravating factor**

    If the evidence establishes that the infliction of serious injury was done in an especially heinous, atrocious or cruel manner, N.C.G.S. § 15A-1340.4(a)(1) does not prohibit the finding of that aggravating factor merely because infliction of a serious injury is an element of the offense.

**17. Criminal Law § 138.21— felonious assault—especially heinous, atrocious or cruel aggravating factor**

    The evidence in a prosecution for assault with a deadly weapon with intent to kill resulting in serious injury would support a finding of excessive brutality, psychological suffering and dehumanizing aspects not normally present in such an offense which in turn supports the trial court's finding as an aggravating factor that the offense was especially heinous, atrocious or cruel.

**18. Criminal Law § 138.41— mitigating factor—good character—insufficient evidence**

    The evidence at a sentencing hearing for first degree sexual offense, attempted first degree rape and felonious assault did not require the trial judge to find the mitigating factor that defendant has been a person of good character. N.C.G.S. § 15A-1340.4(a)(2)(m).

APPEAL by defendant from judgments entered by *Rousseau, J.,* at the 30 April 1984 Criminal Session of Superior Court, GUILFORD County. Heard in the Supreme Court on 20 November 1985.

    The defendant was convicted by a jury of first degree sexual offense, attempted first degree rape, and assault with a deadly weapon with intent to kill inflicting serious injury. Following a sentencing hearing, the defendant was sentenced to life imprisonment for the offense of first degree sexual offense, twenty years for attempted first degree rape, and twenty years for assault with a deadly weapon with intent to kill inflicting serious injury, all sentences to be served consecutively. The defendant appealed the life sentence to this Court as a matter of right pursuant to N.C.G.S. § 7A-27(a), and we granted the defendant's motion to by-pass the Court of Appeals in the attempted rape and assault cases on 24 April 1985.

*Lacy H. Thornburg, Attorney General, by James J. Coman, Special Deputy Attorney General, and Joan H. Byers, Assistant Attorney General, for the State.*

*Mary K. Nicholson for defendant-appellant.*

BILLINGS, Justice.

The victim testified for the State and identified the defendant as the person who came to her apartment around 7:30 p.m. on 19 December 1983. She said that he identified himself as "Eddie" when he knocked on her apartment door, and when she opened the door, she recognized him as John Ed, a hairdresser friend of her roommate's. She had seen him on four previous occasions during the fall of 1983, once at his apartment on Halloween, twice when he cut her roommate's hair in her apartment and once when he dropped by the apartment in November while her mother was present.

She testified that on 19 December she was busy and after about twenty minutes she asked him to leave.

Instead of leaving, the defendant attacked the victim and threatened her with a knife. They struggled in the living room, and during the struggle she pulled a button off his shirt. He then forced her into the bedroom, disrobed and, while holding the knife on her, undressed her. After attempting to rape her but failing to achieve penetration, he forced her to perform fellatio.

After both parties dressed, the defendant became agitated and attacked the victim again, choking her and beating her head against the floor until she lost consciousness. When she returned to consciousness, she was undressed, on the bed, and the defendant was stabbing her in the stomach. She lost consciousness again and was awakened by the telephone ringing. She crawled to the telephone and called the operator for assistance.

The AT&T operator on duty at the time contacted the Greensboro Police Department. The emergency call to the Police Department was recorded at 8:52 p.m. When Officer Timothy Blair of the Greensboro Police Department arrived at the scene, he observed the victim, nude except for a pair of socks, lying in the doorway from her apartment to the hall where she had dragged herself from the bedroom. She had a three-inch laceration of her throat

and a gash in her abdomen from which her internal organs were protruding. The emergency medical personnel testified that when they arrived the victim had no blood pressure.

Doctors who treated the victim testified that her trachea had been almost completely severed, her stomach and small intestine were cut and the inferior vena cava, the body's main vein, had been severed. She was in the hospital for a month.

While in the hospital in intensive care, almost immediately after awakening from surgery, the victim told the police that a friend of her roommate's whom she knew as John Ed or Eddie had attacked her. At that point, she could not talk because of a plastic tube in her throat, but she wrote notes; she also asked for a Greensboro telephone book and pointed out the hair salon where the defendant worked. She described her assailant and the knife.

Based upon the victim's identification, the police obtained a warrant for the defendant's arrest on 20 December 1983 for the assault offense.

The police recovered from the victim's living room floor a button with attached thread and cloth which matched a blue flannel shirt they seized from the defendant's apartment. Blood which matched that of the victim was found inside a boot seized from the defendant's apartment. The defendant refused to give a blood sample; therefore, a semen stain found on a blanket taken from the victim's bed could not be tested for a match with the defendant's blood type. A head hair taken from defendant was microscopically consistent with hairs found on the victim's sweater, blanket and quilt. The defendant's housemate described a hunting knife which the defendant had purchased in the fall of 1983 and which generally fit the description of the knife which the victim said the defendant had used. No knife was produced at trial.

The defendant did not present evidence at the guilt phase of the trial. He presented character evidence at the sentencing hearing.

The defendant brings forward numerous assignments of error. We find that the defendant received a fair trial free of prejudicial error.

I. *Right to Counsel.*

[1]   The defendant contends that he was denied effective assistance of counsel, due process of law and equal protection of the law when Judge Freeman refused to allow the defendant's court-appointed lawyer, Mr. Charles White, to withdraw as counsel on 19 April 1984 and to appoint new counsel when the defendant requested that Mr. White be discharged. Although the record contains a waiver of counsel signed by the defendant on 27 December 1983, it also appears that the Public Defender's Office was appointed on 4 January 1984 to represent the defendant. Mr. White, Assistant Public Defender, was assigned to the defendant's case.

On 17 April 1984 the defendant filed with the Office of the Clerk of Superior Court of Guilford County a letter notifying the Clerk that the Public Defender's Office was no longer representing him and requesting the appointment of private counsel.

On 19 April 1984, Mr. White filed a motion to withdraw from representation of the defendant and in support thereof stated:

3. The defendant, or others on his behalf, have employed a private investigator to explore the "feasibility" of retaining private counsel and to assist in the preparation of his case. The investigator is under instructions to not divulge the results of his investigations to the undersigned; and

4. The defendant and others on his behalf have actively pursued the possibility of retaining private counsel, thereby indicating that funds may be available for privately retained counsel. This activity has also limited the amount of time the undersigned has been able to devote to the case due to the uncertainty as to whether he will be representing the defendant at trial; and

5. The defendant has refused to provide the undersigned with information essential to his defense. The attorney-client privilege does not permit the undersigned to list specific examples; and

6. Diligent efforts have been made by the undersigned to resolve these differences with the defendant to no avail. On April 3, 1984 the undersigned wrote the defendant indicating his intention to seek the Court's permission to withdraw if

the differences between he and the defendant were not re-solved; and

7. Further conversations with the defendant on April 12, 1984 led the undersigned to believe that the differences could possibly be resolved and the defendant was verbally in-formed that the Public Defender's Office would endeavor to continue to represent him; and

8. On April 14, 1984 the defendant wrote the Clerk of Superior Court indicating that the Public Defender had "re-signed," and he requested that the State appoint a private at-torney to represent him. A copy of that letter is attached; and

9. Numerous additional factors which cannot be divulged due to the attorney-client privilege have convinced the under-signed that it will be impossible for him to adequately repre-sent the defendant, and that the ends of justice will be best served by allowing him to withdraw.

Judge Freeman conducted a hearing on Mr. White's motion on 19 April 1984. Other than the specific reasons listed in his mo-tion, Mr. White would reveal no reason for his motion to with-draw, stating that he was concerned about possibly violating the defendant's attorney-client privilege.

When questioned about whether he wanted Mr. White to withdraw, the defendant responded that he did, but gave as his reason only that "things didn't work out as they should" and that it was important to him that his case be prepared and presented properly.

Judge Freeman conducted a very patient, thorough inquiry, but no additional basis for allowing Mr. White to withdraw was ever given other than that "irreconcilable differences" existed between the defendant and Mr. White. Mr. White said that if or-dered to continue to represent the defendant, he would make every effort to represent him as "fully as I could, and to the best of my ability, and be true to my oath of office." Judge Freeman told the defendant that Mr. White was a highly competent, very experienced trial lawyer and denied the motion.

The defendant then, in open court and after conferring with Mr. White, asked that Mr. White be discharged and that the defendant be allowed to represent himself with Mr. White's help.

Judge Freeman conducted the inquiry required by N.C.G.S. § 15A-1242, and discussed at length with the defendant the consequence of not having counsel. The defendant stated that he wanted to represent himself but to have assistance from Mr. White.

At 12:43 p.m. the judge recessed court for lunch. When court reconvened at 2:00 p.m. Judge Freeman again addressed the defendant and asked if he wanted to say anything more about the nature of the conflicts between the defendant and Mr. White, particularly as to whether the conflict was over something more than trial tactics. The defendant then read to the judge from a list of his complaints against Mr. White, and Mr. White responded. This further colloquy only repeated the grounds included in Mr. White's motion and suggested that the defendant was refusing to cooperate with his counsel and was seeking to obtain the services of private counsel. Judge Freeman found that there was nothing that would prohibit Mr. White from providing effective assistance of counsel to the defendant and denied the defendant's request for appointment of another attorney.

He again asked the defendant if he wanted to represent himself with Mr. White as standby counsel. The defendant said that he did. Judge Freeman then inquired into the defendant's age, education, literacy and mental or physical handicaps. He again admonished the defendant that neither the judge nor the District Attorney would assist him in the trial of the case and asked if he understood what he faced and still wanted to represent himself. Upon receiving an affirmative response, Judge Freeman had the defendant execute a waiver of the right to assigned counsel and made the following findings of fact:

> that the defendant is an adult, that he completed the tenth grade in school, that he is able to read and write, that he has no mental handicaps or physical handicap; that he is intelligent, articulate, that he understands the nature of the charges against him, that he understands the proceedings, that he understands the possible punishment; that he understands his right to be represented by an attorney, and he understands the ramifications of his waiving an attorney.

The judge then concluded that the defendant had voluntarily and intelligently waived his right to a court-appointed attorney. He allowed Mr. White to be removed as the active attorney in the case and appointed him as standby counsel.

When the defendant's case was called for trial on 30 April 1984, Judge Rousseau, the presiding judge, questioned the defendant about his election to represent himself with Mr. White as standby counsel, and the defendant indicated that he knew his rights and wanted to proceed without an attorney.

Certain defense motions which are discussed *infra* were then ruled upon by the court. Before jury selection began, the trial judge inquired about the number of persons present in the courtroom and was informed that the defendant had subpoenaed a number of character witnesses. When the trial judge told the defendant that he would limit the number of character witnesses that the defendant could call, the defendant requested time to talk with the witnesses, and the trial judge declared a recess. At the end of the recess, the defendant requested that Mr. White be allowed to try the case, whereupon Judge Rousseau conducted an inquiry and reinstated Mr. White "as full-time counsel."

It is a cardinal principle of constitutional law that an indigent criminal defendant has a right to assistance of counsel. *Argersinger v. Hamlin*, 407 U.S. 25, 32 L.Ed. 2d 530 (1972). However, this does not mean that the defendant is entitled to counsel of his choice or that defendant and his court-appointed counsel must have a "meaningful attorney-client relationship." *Morris v. Slappy*, 461 U.S. 1, 75 L.Ed. 2d 610 (1983). Each case must be examined on an individual basis. In the absence of a constitutional violation, the decision about whether appointed counsel shall be replaced is a matter solely for the discretion of the trial court. *State v. Sweezy*, 291 N.C. 366, 371-72, 230 S.E. 2d 524, 529 (1976), quoting from *United States v. Young*, 482 F. 2d 993, 995 (1973). As this Court said in *State v. Hutchins*, 303 N.C. 321, 335, 279 S.E. 2d 788, 797 (1981):

> In the absence of any substantial reason for the appointment of replacement counsel, an indigent defendant must accept counsel appointed by the court, unless he wishes to present his own defense. *E.g., State v. Robinson*, 290 N.C. 56, 224 S.E. 2d 174 (1976). A disagreement over trial tactics does

not, by itself, entitle a defendant to the appointment of new counsel. *State v. Thacker*, 301 N.C. 348, 271 S.E. 2d 252 (1980); *State v. Robinson, supra.* Nor does a defendant have the right to insist that new counsel be appointed merely because he has become dissatisfied with the attorney's services. *State v. Sweezy*, 291 N.C. 366, 230 S.E. 2d 524 (1976); *State v. Robinson, supra.* Similarly, the effectiveness of representation cannot be gauged by the amount of time counsel spends with the accused; such a factor is but one consideration to be weighed in the balance. *E.g., Missouri v. Turley*, 443 F. 2d 1313 (8th Cir.), *cert. denied*, 404 U.S. 965 (1971); *O'Neal v. Smith*, 431 F. 2d 646 (5th Cir. 1970).

Judge Freeman found that the defendant had failed to show anything that would hinder Mr. White from providing an adequate and proper defense to the defendant or that would prohibit him from providing effective counsel to the defendant. His findings are supported by the record.

When the defendant provided his list of complaints to Judge Freeman about Mr. White's representation, he said, first, that Mr. White had breached his trust with another attorney, "without my [the defendant's] written consent."

Mr. White in response stated:

I have, in fact, been approached by one other attorney, a member of the private Bar, . . . and I—I did not divulge anything that was not of public record at that time.

We did discuss the general structure of the case, discussed what the charges were. I did not divulge anything that had arisen during the course of our relationship . . . .

The defendant has failed to establish any impropriety on the part of Mr. White in regard to his discussion of the defendant's case with any other lawyer.

Second, the defendant said "to my—in my mind, I have—I haven't had any counseling whatsoever." He then related, apparently as a part of the complaint about the lack of counseling, that Mr. White was ambivalent about hiring a private detective and did not like the fact that a friend of the defendant's had employed a private detective for him. Mr. White responded that

he would have welcomed assistance from a private detective, but that the investigator employed for the defendant was under specific instructions not to divulge information to Mr. White. He further stated that the defendant had informed him the previous week that someone on the defendant's behalf had employed a private detective "to investigate [Mr. White], personally, and [his] reputation, and as to [his] former employment in Raleigh." Mr. White then identified this "kind of thing" as having put him and the defendant "in an antagonistic situation."

The defendant also made reference to blood tests and to the fact that he was not advised of his "right to consent, or anything, involved in the blood test." As is discussed *infra*, Mr. White was on vacation when the defendant was first ordered to submit to a blood test and the defendant refused to submit to the procedure with substitute counsel in Mr. White's absence. Later, when Mr. White was present during a contempt hearing based on the defendant's refusal to comply with the order, the defendant continued to refuse to comply, and no blood was drawn.

Finally, the defendant stated generally that "just the whole — just the simple fact, like when I wanted correspondence concerning my case, you know, concerning; I never did get it, you know. So, it's just — it's just a bad situation."

Nothing in any of these statements to the hearing judge gave any reason justifying replacement of defendant's counsel. It clearly shows that the defendant was being uncooperative, working behind his counsel's back and creating a difficult, frustrating situation for Mr. White. However, Mr. White continued to be willing to represent the defendant to the best of his ability, and in fact conducted a spirited defense of his client once he was allowed to re-enter the case as counsel.

Judge Freeman's findings are fully supported by the record.

As this Court said in *Hutchins*, the findings made by the trial court at the hearing on a motion to withdraw are conclusive on appeal if they are supported by any competent evidence. 303 N.C. at 335, 279 S.E. 2d at 797-98. Having refused to cooperate with his appointed counsel and then chosen to represent himself, the defendant cannot now complain that he was entitled to substitute counsel because he would not cooperate with the first one. *See*

*Thomas v. Wainwright*, 767 F. 2d 738 (11th Cir. 1985), *cert. denied*, --- U.S. ---, 89 L.Ed. 2d 349 (1986); *Hutchins v. Garrison*, 724 F. 2d 1425 (4th Cir. 1983), *cert. denied, stay denied*, 464 U.S. 1065, 79 L.Ed. 2d 207 (1984); and *Morris v. Slappy*, 461 U.S. 1, 75 L.Ed. 2d 610.

With respect to the defendant's contention that he chose to represent himself only because the trial court refused to appoint substitute counsel, it is apparent from the record that that is indeed the case. However, defendant's being in the position to have to make that choice is not violative of his constitutional rights. An indigent defendant has the right to appointed counsel, but not to the counsel of his choice. If a defendant is dissatisfied with the services of his appointed counsel, but there is no reason to appoint substitute counsel, the defendant has the right not to have the services of his unwanted counsel forced on him and to represent himself. *Faretta v. California*, 422 U.S. 806, 45 L.Ed. 2d 562 (1975); *State v. Robinson*, 290 N.C. 56, 224 S.E. 2d 174 (1976); *State v. McNeil*, 263 N.C. 260, 139 S.E. 2d 667 (1965). The judge must conduct an inquiry pursuant to N.C.G.S. § 15A-1242 to ascertain that the defendant's waiver of counsel is knowing and voluntary. *State v. Thacker*, 301 N.C. 348, 271 S.E. 2d 252 (1980).

In this case, Judge Freeman spent the better part of a day investigating the nature of the problem between defendant and Mr. White and trying to find the best solution. At that time, the judge conducted the inquiry required by N.C.G.S. § 15A-1242 and satisfied himself that in light of the defendant's desire not to be represented by Mr. White, he understood what he was undertaking in choosing to represent himself. Judge Freeman then appointed Mr. White as standby counsel, in accordance with his discretionary right under N.C.G.S. § 15A-1243. This entire proceeding conformed to the proper statutory and constitutional requirements.

This assignment of error is overruled.

II. *Defendant's Motion to Continue.*

[2] The defendant next contends that the refusal of the trial court to grant a continuance until a critical witness for the defense could be present was an abuse of discretion and denied his rights guaranteed by the United States Constitution and the

North Carolina Constitution. Defense counsel renewed this motion at the close of the State's case and also moved for a recess for the purpose of allowing the defendant to secure the attendance of the witness. Both motions were denied.

The defendant filed a motion to continue on 26 April 1984 requesting a continuance because of the unavailability of a named witness for whom he had issued a subpoena. In a "memorandum in support of motion to continue," the defendant said:

1. That [the witness] is an essential witness to the defendant's case in that she was with the defendant on the night of the alleged crimes and is able to testify to numerous pertinent facts concerning the events of that evening and other relevant information; and

2. That the defendant has kept in constant contact with [the witness] since his arrest in January of 1984. Since that time, she has known her testimony was essential in his case, and that he was to come to trial on April 30, 1984; and

3. That the defendant last spoke with [the witness] by telephone on April 21, 1984, informing her that he would need her testimony on April 30, 1984; and

4. That the defendant wrote to [the witness] on April 24, 1984, requesting that she appear in his behalf on April 30, 1984; and

5. That upon attempting to serve a subpoena on [the witness] on April 26, 1984, the defendant learned that [the witness] had "left suddenly" for Hawaii and would not return until on or about May 7, 1984; and

6. That [the witness] had previously expressed reservations to the defendant about testifying in his behalf . . . .

When the defendant's case was called for trial on 30 April 1984 and while the defendant was appearing *pro se*, the trial judge heard arguments on the motion to continue and denied the motion.

After Mr. White was reinstated as trial counsel, before jury selection began, Mr. White renewed the defendant's motion to continue and requested that the trial judge consider additional in-

formation consisting of the testimony of Mr. Edward L. Cobbler, the private investigator employed on the defendant's behalf. Without objection by the State, the trial judge allowed the defendant to present the testimony of Mr. Cobbler on *voir dire* regarding the information that he had obtained from the witness.

In summary, the witness stated to Mr. Cobbler that the defendant came to her house in Greensboro between 5:30 p.m. and 6:00 p.m. on 19 December 1983 and remained with her until they left her house in separate cars at about 7:00 p.m. to go to his house. Although she was supposed to follow him, she lost contact about 7:15 p.m. Thereafter she looked for him at a couple of bars, on Groometown Road, at his home and at her house and could not find him until about 9:00 p.m. when she returned to his house a third time and saw his truck parked there. She went to the back door of defendant's house and he was there. He had just taken a shower, was completely nude and was doing a wash. She stated that before 7:15 p.m. he had been wearing blue jeans, his work boots, a blue-checkered flannel shirt, and "one of those mesh jackets" of black leather. She also said that he owned a new, large hunting knife that he got from the Army-Navy Surplus Store.

According to the victim's testimony at trial, the defendant arrived at the victim's apartment around 7:30 p.m. He was wearing a black jacket, a light blue plaid flannel shirt and jeans.

Other evidence for the State established that the emergency call from the victim was received at 8:52 p.m. A blue flannel shirt with a missing button was seized from the defendant's room, and the button with adhering thread and blue fabric found in the victim's living room matched the buttons, thread and fiber from the shirt.

The State offered to stipulate at trial to the testimony that the witness would have given as related by Mr. Cobbler. The defendant refused to stipulate. The trial judge again denied the defendant's motion.

Ordinarily, a motion to continue is addressed to the sound discretion of the trial judge and is reviewable only for abuse of discretion. *State v. Weimer*, 300 N.C. 642, 647, 268 S.E. 2d 216, 219 (1980).

"An equally well-established rule, however, is that when a motion raises a constitutional issue, the trial court's action upon it involves a question of law which is fully reviewable by an examination of the particular circumstances presented by the record on appeal of each case."

*State v. Branch*, 306 N.C. 101, 104, 291 S.E. 2d 653, 656 (1982) citing *State v. Searles*, 304 N.C. 149, 282 S.E. 2d 430 (1981).

The defendant contends that the denial of his motion to continue denied him "due process of law and his right to equal protection of the laws, as guaranteed by the Fifth, Sixth and Fourteenth Ammendments [sic] to the United States Constitution and Art. I, Sections 19 and 23 of the North Carolina Constitution." The defendant further contends that the production of a material witness is fundamental to the rights of a defendant and that the trial judge abused his discretion by denying the motion based upon his factual determination that the defendant could have committed the offense during the time that the defendant was out of the presence of the witness. The defendant contends that he should have been given the opportunity to present the witness so that the jury could determine whether the witness' statement could establish an alibi.

Although not denominated such by the defendant, the constitutional issue presented by this assignment of error is whether the right of a criminal defendant "to have compulsory process for obtaining witnesses in his favor" guaranteed by the Sixth Amendment to the Constitution of the United States was violated by denial of the defendant's motion to continue when his subpoena was not served because the witness had left the state, and whether the same denial violated his right under the Constitution of North Carolina, Article I, § 23 which provides:

In all criminal prosecutions, every person charged with crime has the right . . . to confront the accusers and witnesses with other testimony . . . .

When the trial judge denied the defendant's motion to continue the first time, he did not make findings of fact or state reasons for so doing. However, the District Attorney had argued that the defendant had failed to show that the witness was a material witness and had pointed out that in the defendant's mo-

tion the defendant indicated that the witness was reluctant to testify. After the question of the continuance was reopened, the private investigator who talked with the witness indicated that he had questioned the witness on 22 February 1984. A joint motion of the State and defendant to continue the case from 17 February through 2 April, dated 17 February 1984, had been filed and granted on 21 March 1984. In his written motion to continue from the 30 April 1984 date, the defendant stated that he had kept in constant contact with the witness since his arrest in January of 1984 and that since that time "she has known her testimony was essential in his case and that he was to come to trial on April 30, 1984." Therefore, the record clearly shows that the defendant was aware for several weeks of his trial date and yet did not issue a subpoena for this witness, who had indicated her reluctance to testify, until 26 April 1984. Further, the defendant was unable to show any way in which the witness's testimony would be helpful to the defendant, except to show "how he appeared shortly after this crime supposedly happened." Counsel admitted that the witness could not establish an alibi.

As this Court has long suggested, a motion for a continuance should be supported by an affidavit showing sufficient grounds for the continuance. *State v. Branch*, 306 N.C. 101, 105, 291 S.E. 2d 653, 657; *State v. Cradle*, 281 N.C. 198, 208, 188 S.E. 2d 296, 303, *cert. denied*, 409 U.S. 1047, 34 L.Ed. 2d 499 (1972); *State v. Gibson*, 229 N.C. 497, 501, 50 S.E. 2d 520, 523 (1948).

Although the defendant's motion to continue was accompanied by an affidavit which suggested that the witness could establish an alibi for the defendant, the evidence offered on *voir dire* indicated that the testimony of the witness would not be of material aid to the defense. In *State v. House*, 295 N.C. 189, 206, 244 S.E. 2d 654, 663 (1978) this Court addressed the identical constitutional provisions drawn into question here and stated:

As we said in *State v. Wells*, 290 N.C. 485, 491, 226 S.E. 2d 325, 330 (1976), "Here, defendant's lack of diligence in placing his witnesses under subpoena when he had ample opportunity to do so, thus requiring their attendance from day to day, forestalls his belated attempt to place responsibility on the trial judge for their absence." Furthermore, as was said in *Hoskins v. Wainwright*, 440 F. 2d 69, 71 (5th Cir. 1971),

"The right to compulsory process is not absolute, and a state may require that a defendant requesting such process at state expense establish some colorable need for the person to be summoned, lest the right be abused by those who would make frivolous requests."

While we are not prepared to say that a defendant in all cases loses his right to a continuance as a means to protect his constitutional right to produce witnesses by his failure to issue subpoenas more than four days before trial, in the instant case, the defendant has failed to establish such "colorable need for the person to be summoned" as would justify delaying the trial in order to secure attendance of the witness who was known by the defendant to be reluctant and for whom no subpoena was issued until shortly before the scheduled date of trial.

This assignment of error is overruled.

III. *Testimony of Kenneth Korn.*

[3] Defendant next contends that the trial judge committed prejudicial error in his treatment of motions related to the testimony of Kenneth Korn, a witness for the State.

Mr. Korn testified that he was incarcerated in the Guilford County Jail in early March of 1984, that he was in the same cell block as the defendant, and that the defendant told him "that he should have made sure the bitch could never walk, see or hear again, and he should have—should have made sure she was dead." He further testified that the defendant told him that snitches get their throats slit and that if Mr. Korn said anything "he [the defendant] would know where it came from, and that I would be a dead snitch."

The defendant contends that admission over defendant's objection of Mr. Korn's testimony regarding snitches and what happened to them violated N.C.G.S. § 15A-903(a)(2) which requires the State to divulge to the defendant by 12:00 noon on Wednesday prior to the week of trial any oral statement made to a person other than a law-enforcement officer, the existence of which is known to the prosecutor.

As amended, effective 26 August 1983, the portions of N.C.G.S. § 15A-903(a) relevant to this issue provide as follows:

(a) *Statement of defendant.*— Upon motion of a defend-
ant, the court must order the prosecutor:

. . . .

(2) To divulge, in written or recorded form, the
substance of any oral statement relevant to the sub-
ject matter of the case made by the defendant, re-
gardless of to whom the statement was made, within
the possession, custody or control of the State, the
existence of which is known to the prosecutor or
becomes known to him prior to or during the course
of trial; . . . . If the statement was made to a person
other than a law-enforcement officer and if the state-
ment is then known to the State, the State must
divulge the substance of the statement no later than
12 o'clock noon, on Wednesday prior to the beginning
of the week during which the case is calendared for
trial.

The record contains no discovery request or motion of the
defendant. However, the record does reflect that on 25 April 1984
the State served upon the defendant a notice that the State in-
tended to use an oral statement made by the defendant, the sub-
stance of which was, "If I had made sure the bitch was dead, I
wouldn't be in this mess now."

The trial judge did not err by overruling the defendant's ob-
jection to the testimony of Mr. Korn on the ground of failure to
comply with N.C.G.S. § 15A-903. Even if we were to assume that
the legislature intended for the substance of a statement made by
the defendant to a person other than a law enforcement officer to
be divulged by the State without motion by the defendant, notice
of the substance of the statement "relevant to the subject matter
of the case" was timely given to the defendant. Those portions of
Mr. Korn's testimony to which objection was made and as to
which notice was not given related to an explanation of why the
witness came forward with the evidence. He stated in essence
that Mr. Kuplen accused him of being a snitch and threatened him
by saying, "Remember, snitches always, you know, that talk,
always get this (indicating), across the throat, like this." After
talking with his father, Mr. Korn decided that if he was going to
be accused of being a snitch anyway, he might as well tell.

Objections at trial to other references to "snitches" appeared to be made on the ground that they were hearsay, although no ground was stated. When the witness clarified that the defendant was the person who warned the witness about what would happen to snitches, the objections were overruled. We hold that there is no merit to the defendant's contention that the judge should have excluded the evidence because of a failure to comply with N.C.G.S. § 15A-903(a)(2).

Further, even if a violation had occurred, sanctions for failure to comply with discovery procedures may be imposed in the sound discretion of the trial judge. *State v. King*, 311 N.C. 603, 320 S.E. 2d 1 (1984). Since no discovery sanction was requested by the defendant, he cannot now claim that the failure of the trial judge *ex mero motu* to exclude the evidence as a sanction for failure to comply with discovery procedures was an abuse of discretion.

[4]   We further hold that objection to the witness's testimony on the ground that it was hearsay likewise is without merit, for the witness, after the defendant's objection was made at trial, clearly stated that the statements and threats were made by the defendant to the witness, not, as suggested in the defendant's brief, by the defendant to someone else who related the statements to the witness. N.C.G.S. § 8C-1, Rule 801(d).

[5]   The defendant further contends that the trial judge erred in allowing the witness Korn to testify and in not allowing the defendant's motion for a mistrial when the defense attorney learned that he had a conflict of interest and could not cross-examine Mr. Korn effectively because of the conflict.

The record reflects that no objection to Mr. Korn's testimony on the ground of a conflict of interest was made when he was called to the stand or throughout direct examination. After defense counsel questioned the witness about charges pending against him and about whether or not he was to receive a benefit from the State because of his testimony, defense counsel requested a recess during which he conferred with other members of the staff of the Public Defender's Office. He then was allowed to approach the bench, but the conference was not recorded. Defense counsel continued his cross-examination of Mr. Korn

regarding his expectation of benefit from his testimony. The witness was then excused.

When the State rested its case, the following exchange between the trial judge and defense counsel occurred out of the presence of the jury:

THE COURT: Now, Mr. White, during your cross examination of the [sic] Kenneth Korn, you approached the bench, after you had cross examined the defendant [sic] to some extent, and stated that Mr. Churchill in the Public Defender's Office represented Mr. Korn.

MR. WHITE: That's correct.

THE COURT: And you raised the question of a possibility of a conflict.

You stated to me, here at the bench, that you knew nothing about his case.

MR. WHITE: That's right—

THE COURT: Mr. Churchill representing him.

MR. WHITE: That's correct.

THE COURT: And, as I recall, Mr. Korn's testimony, I don't recall him saying that he talked to his lawyer about testifying here in this court.

MR. WHITE: That's correct, Your Honor. I do—I do have information—I have got information as to what he is charged with, that's all the information I have.

THE COURT: Well, that's public record. I told you, when you approached the bench, I told you to go ahead and cross examine him to any extent that you wanted to.

All right, sir.

Defense counsel shortly thereafter made a motion for a mistrial on the basis that an inherent conflict existed because Mr. Churchill of the Public Defender's staff represented Mr. Korn. The defendant assigns denial of that motion as error.

The claim that a possible conflict of interest limited defense counsel's ability to cross-examine the witness raises a question of

whether the defendant's right to confront his accusers, guaranteed by the Sixth Amendment to the Constitution of the United States and by Article I, § 23 of the North Carolina Constitution, has been violated and if so, whether the violation was harmless.

The United States Supreme Court in *Delaware v. Van Arsdall*, --- U.S. ---, --- L.Ed. 2d ---, 54 U.S.L.W. 4347 (7 April 1986) applied the harmless constitutional error rule to a confrontation clause violation when a defendant was barred from conducting cross-examination designed to show a witness' bias. In that case the Court said:

> [A]s we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. ---, --- (1985) (*per curiam*) (emphasis in original).

*Id.* at ---, --- L.Ed. 2d at ---, 54 U.S.L.W. at 4349.

The Court went on to say that if a defendant's *opportunity* for effective cross-examination is denied, the error may be harmless under the rule of *Chapman v. California*, 386 U.S. 18, 17 L.Ed. 2d 705 (1967) (the reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction), and that whether an error is harmless depends on a variety of factors, including:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall*, --- U.S. at ---, --- L.Ed. 2d at ---, 54 U.S.L.W. at 4350.

In the instant case, we are not satisfied that the defendant's confrontation rights were violated, for the defendant has pointed to nothing which suggests that his counsel would have conducted the cross-examination of Mr. Korn differently if the perceived conflict had not been made known to him during the course of the

cross-examination. Mr. White stated that because another member of his office represented Mr. Korn, he did not want to send his investigators out "to do what they could . . . . I could not have a way to effectively dig up what I could on the guy."

At the time of the witness' testimony, he had already entered a plea of guilty to the charges upon which the Public Defender's Office was representing him and was awaiting sentence.

In *State v. Thomas*, 310 N.C. 369, 312 S.E. 2d 458 (1984) the trial judge had refused to allow defense counsel to withdraw when he learned that a former client was a potential State's witness. The representation had been in regard to an unrelated matter, but defense counsel also had advised the potential witness' mother concerning the very incident about which the witness was to testify at trial. The trial judge denied the motion, ruling that the prior representation did not create a conflict of interest as a matter of law. This Court said: "We do not reach the question of whether the denial of the motion to withdraw constituted an abuse of discretion, since defendant has failed to demonstrate that the ruling resulted in prejudice to him." *Id.* at 375, 312 S.E. 2d at 461.

Likewise, here the defendant has failed to establish prejudice. Defense counsel had conducted a substantial portion of his cross-examination before he became aware of the possible conflict. He denied having any information which his agency's representation of Mr. Korn had made available to him. Whether Mr. Korn was represented by another member of the Public Defender's staff or by an unrelated attorney, the attorney-client privilege would prevent the attorney from being called as a witness to testify, over Mr. Korn's objections, to conversations between the attorney and his client in refutation of Mr. Korn's denial that he had talked with his attorney about the effect of his testimony. Further, nothing in the attorney-client privilege prohibited Mr. White from obtaining non-privileged information concerning the witness and using it to this defendant's benefit. A concern in that case about creating an appearance of impropriety might suggest the necessity for Mr. Churchill to withdraw as counsel for Mr. Korn if Mr. Korn so desired, but no prejudice to the present

defendant could be demonstrated. Mr. Korn at no time sought to invoke the attorney-client privilege.

If, however, we were to conclude that the defendant's confrontation rights were violated, we further conclude that such error was harmless beyond a reasonable doubt. The testimony of the witness Korn was not essential to the State's case, although it supported the inference of an intent to kill that was raised by the nature and extent of the injuries inflicted upon the victim. The defense counsel in fact cross-examined the witness concerning the witness' reason for testifying, attempting to show that the witness had a motive of self-benefit which tended to impeach his credibility. No showing has been made that the perceived conflict *actually* influenced the scope of cross-examination. And, finally, the State's evidence was clear, strong, consistent and overwhelming.

This assignment of error is overruled.

IV. *Pre-trial Identification.*

[6] In his brief the defendant states that he:

contends that the admission over the defendant's objection at trial of eye witness identification testimony following a pretrial identification by photograph was reversible error in that such identification was based solely on the lone display of the defendant's photograph to the victim and was so impermissibly suggestive as to give use [sic] to a very substantial likelihood of irreparable misidentification.

Not only does the record not support this assertion, but the defendant failed to make a pre-trial motion to suppress the evidence or to show that he did not have a reasonable opportunity to do so as required by N.C.G.S. § 15A-975.

The defendant did object at trial to the victim's in-court identification of the defendant. Following an unrecorded bench conference the objection was overruled. On cross-examination the following questions were asked by defense counsel and answers given by the victim:

Q. Okay. Do you recall Detectives Brady and Baulding coming into the intensive care unit, and showing you some pictures?

A. Yes, I do.

Q. Would you describe those pictures for us?

A. It was a big mug book. And I thumbed through several pages, and when I saw the defendant, I pointed to the defendant, and said, this is the man that did this to me — or, well, I indicated, since I couldn't talk, I indicated, and then they took the book and left.

On re-direct, the victim identified and the District Attorney introduced State's Exhibit 25, which was a double page from a mug book and contained eight black and white photographs of white males. The victim stated that Detective Brady showed her the pictures while she was in the hospital but that no one suggested which photograph she should pick and that she pointed to the defendant's picture. The victim's description of the photographic identification was corroborated by Detective Brady. There is absolutely nothing in the record which suggests a "lone display of the defendant's photograph to the victim."

Even if the defendant had not waived his right to object to the in-court identification by failing to make a pre-trial motion to suppress, this Court has held that the failure of the trial court to conduct a *voir dire* examination and make findings of fact when a defendant objects to an in-court identification will be deemed harmless error when the record shows that the in-court identification was not tainted by an improper pre-trial identification. *State v. Stepney*, 280 N.C. 306, 185 S.E. 2d 844 (1972); *State v. Williams*, 274 N.C. 328, 163 S.E. 2d 353 (1968). *See also State v. Phillips*, 300 N.C. 678, 268 S.E. 2d 452 (1980) (where there is no material conflict in the evidence on *voir dire*, it is not error to admit challenged evidence without making specific findings of fact). In the instant case, all of the evidence shows that the only pre-trial identification by the victim was a fairly conducted, multiple picture, photographic identification which was not impermissibly suggestive. Further, the evidence is uncontradicted that the victim knew the defendant from previous contacts and spent some twenty minutes conversing with him in her apartment before he began to attack her. Thus, her in-court identification of the defendant was of an origin independent of any pre-trial identification procedure.

This assignment of error is totally without merit.

V.  *Cross-examination of the Victim.*

When the defense counsel was cross-examining the victim about how she knew the defendant, he asked her about a time when the victim's mother was visiting her and the defendant showed up at her apartment one evening in November of 1983 at around 10:00 p.m. The following exchange took place:

Q. Do you recall telling him about an incident that happened before, that startled you, as a result of someone coming into your apartment?

A. Yes, I told him about it.

Q. Can you tell the jury about that—

MR. COMAN: I object to that; that's irrelevant.

THE COURT: All right. Sustained.

By MR. WHITE:

Q. Have you previously called the police, about somebody coming into your apartment?

MR. COMAN: Object, unless he can connect it to this, Your Honor.

THE COURT: Well, sustained, as to that question.

[7]  The defendant argues on appeal that the question was relevant and the trial court, by sustaining the objection to it, deprived him of his right effectively to confront the witness against him and the right to present his defense. "It is well settled that in a criminal case an accused is assured his right to cross-examine adverse witnesses by the constitutional guarantee of the right of confrontation." *State v. Newman*, 308 N.C. 231, 254, 302 S.E. 2d 174, 187 (1983). However, the defendant has not shown in the record what the witness' answer would have been to this question and thus how it was relevant. By this omission, he has failed to show prejudice by the exclusion of the testimony. *State v. Maynard*, 311 N.C. 1, 11, 316 S.E. 2d 197, 203, *cert. denied,* --- U.S. ---, 83 L.Ed. 2d 299 (1984); *State v. Banks*, 295 N.C. 399, 410, 245 S.E. 2d 743, 750 (1978). "This rule applies not only to direct ex-

amination but to questions on cross-examination as well." *State v. Miller*, 288 N.C. 582, 593, 220 S.E. 2d 326, 335 (1975).

This assignment of error is therefore overruled.

VI.  *Evidence of Defendant's Refusal to Comply with Non-testimonial Identification Order.*

[8]  The next question presented by the defendant is:

> Did the trial court err in permitting the prosecutor to question its witnesses about the defendant's failure to provide a blood sample, on the grounds that the questioning was improper and deprived the defendant of his right to remain silent and due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Art. I, Sections 19 and 23 of the North Carolina Constitution.

The defendant twice refused to comply with a nontestimonial identification order to submit to a blood test, once when his attorney was out of the country and he refused the services of a substitute attorney, and again when his attorney had returned. He was found in contempt of court but no punishment was imposed. The defendant filed a motion *in limine* requesting exclusion of any evidence regarding his refusal to submit to the blood test. The ground for the motion was that the evidence was incompetent, irrelevant and immaterial. The trial judge reserved ruling on that portion of the defendant's motion.

Maureen Higgins, an FBI agent in the Forensic Serology Unit of the FBI Crime Laboratory, testified at trial that one of the State's exhibits was a blood sample from the victim. The prosecutor then asked:

> Q. All right. Did you ever receive a blood sample, identified to you as coming from the defendant?
>
> MR. WHITE: Object.
>
> THE COURT: Overruled.
>
> A. No, I did not.

Agent Higgins went on to testify that the bloodstain in the left boot of one pair of boots seized from the defendant's apart-

ment was consistent with the victim's blood, and that there was a semen stain on a blanket taken from the victim's bedroom. The prosecutor asked:

> Q. During the course of your analysis at the lab, did the defendant ever provide a sample of his blood, in order for you to analyze it?
>
> A. No —
>
> MR. WHITE: Objection —
>
> THE COURT: Sustained. Don't answer.
>
> MR. COMAN: Sir?
>
> THE COURT: She answered "no"; overruled. No.

The defendant at no time objected at trial upon any of the grounds which he attempts to bring forward on this appeal. His objection to the testimony on the ground of relevancy was properly overruled, for the State was entitled to explain why no comparison of his blood with the relevant State's exhibits was performed.

Although not properly before us, we also note that admission of the evidence violated neither the defendant's constitutional privilege against compulsory self-incrimination nor his statutory right under N.C.G.S. § 15A-279(d) against the use of statements made in the absence of counsel during nontestimonial identification procedures.

A criminal defendant's Fifth Amendment privilege against compulsory self-incrimination does not prevent the State from taking blood samples over the defendant's objection and using analysis of the sample as evidence against him. *Schmerber v. California,* 384 U.S. 757, 16 L.Ed. 2d 908 (1966). Likewise, the defendant's failure to submit a sample of his blood is not testimony. *See South Dakota v. Neville,* 459 U.S. 553, 74 L.Ed. 2d 748 (1983). The evidence introduced did not indicate that the defendant had refused to allow his blood sample to be taken.

Neither does evidence that the defendant did not provide a sample of his blood constitute use of a statement by the defendant in violation of N.C.G.S. § 15A-279(d).

N.C.G.S. § 15A-279(d) (1983) provides that:

No statement made during nontestimonial identification procedures by the subject of the procedures shall be admissible in any criminal proceeding against him, unless his counsel was present at the time the statement was made.

In this case, however, nothing defendant said was admitted into evidence. The fact that he did not submit a blood sample is not a statement made during nontestimonial identification procedures and is not a violation of defendant's rights under N.C.G.S. § 15A-279(d).

This claim of error is frivolous and is overruled.

VII. *Defendant's Motions Testing Sufficiency of the Evidence.*

Although the defendant contends in his brief that the trial judge erred in denying his motion, made at the conclusion of the evidence, to dismiss as to all charges, he fails to point to any element upon which the evidence was not overwhelming, let alone sufficient. Likewise, the defendant's motion for judgment notwithstanding the verdict was properly denied.

[9]  The defendant also assigns as error the denial of his motions to set aside the verdict and to arrest judgment. Such motions are addressed to the sound discretion of the trial judge, and in the absence of an abuse of discretion are not reviewable on appeal. *State v. Boykin*, 298 N.C. 687, 259 S.E. 2d 883 (1979). The record reveals no abuse of discretion. The jury was properly presented with the evidence.

These assignments of error are overruled.

VIII. *Jury Instructions.*

The defendant contends that the trial judge erred in the following particulars relating to the jury instructions:

1. He denied the defendant's request that he instruct on the use of circumstantial evidence.

2. He denied the defendant's request that he instruct on the limited use of maps and exhibits.

3. He erred in failing to instruct as to second degree sexual offense, attempted second degree sexual offense, and attempted second degree rape.

4. He violated the rule of *State v. Carter*, 233 N.C. 581, 65 S.E. 2d 9 (1951), which requires impartiality on the part of the trial judge, by instructing the jury that "a knife capable of cutting a person's throat, going into the windpipe or stabbing them in the stomach and going four-inches deep, is a dangerous weapon," and by instructing that "an injury going into the windpipe in the throat, and four-inches deep into the stomach, is a serious injury."

N.C.G.S. § 15A-1231(a) provides that a party may tender written instructions to the judge and must furnish copies to the other parties at the time he tenders them to the judge.

The trial judge refused the defendant's request for instructions in part because the defendant's request consisted only of a list of sections from the Pattern Jury Instructions, Criminal, and was not in compliance with the statutory requirement for written instructions with copies provided to the opposing parties. We do not find it necessary to decide whether a judge may properly refuse a request for instructions on the basis that the instructions are not separately written when the party is requesting an instruction contained in the Pattern Jury Instructions. Rather, we affirm the refusal to give the requested instructions on other bases.

[10] In regard to the instruction on circumstantial evidence, it must be noted that the victim in this case gave direct testimony regarding each element of the crimes charged, except the element of intent to kill in the assault charge, and direct, positive identification of the defendant as the perpetrator. Even when the conviction of the defendant depends upon proof by circumstantial evidence, this Court has held that a failure to give a requested instruction on circumstantial evidence is not error. Chief Justice Branch stated in *State v. Adcock*, 310 N.C. 1, 36, 310 S.E. 2d 587, 607 (1984):

> We hold that an instruction on circumstantial evidence to the effect that a conviction may not be based upon it unless the circumstances point to guilt and exclude to moral

certainty every reasonable hypothesis except that of guilt is unnecessary when a correct instruction on reasonable doubt is given.

In this case the jury was given a correct instruction on reasonable doubt; thus the trial judge properly refused to give the requested instruction on circumstantial evidence.

[11]  During the trial of the instant case, the State introduced a number of photographs and a diagram of the victim's apartment. Although the District Attorney usually stated that the exhibits were offered for illustrative purposes when he offered them into evidence, the defendant did not ask for and the judge did not give a limiting instruction at the time of their receipt. However, during the charge conference the defense counsel requested an instruction "on Photographs, Maps and Models . . . . The charge on that, concerning that they are used only to illustrate the testimony Criminal Instruction 104.50." When the trial judge pointed out that no maps or models had been introduced, defense counsel said: "Well, Judge, the photographs and diagrams in evidence."

N.C.G.S. § 8-97, effective 1 October 1981 and applicable at the time of this trial, provides as follows:

Any party may introduce a photograph, video tape, motion picture, X-ray or other photographic representation as substantive evidence upon laying a proper foundation and meeting other applicable evidentiary requirements. This section does not prohibit a party from introducing a photograph or other pictoral representation solely for the purpose of illustrating the testimony of a witness.

Many if not all of the photographs which were received into evidence could properly have been considered by the jury as substantive evidence. For the trial judge to give a proper instruction limiting the State's exhibits to illustrative use would have required that the defendant specifically identify those exhibits which he contended were subject only to illustrative use. He did not do so, and it was not error for the trial judge to refuse to give the instruction when the request was a general one which applied to all photographs and diagrams. A general instruction on limited use of photographs and diagrams would have been incorrect and misleading. It would seem to be the better practice for a

party wishing to limit the use of evidence offered by his opponent to request a limiting instruction at the time of its admission in order to avoid the kind of problem that existed here. If a proper instruction is given at the time of admission, it is not necessary for the trial judge to repeat it in the final charge. *State v. Crews*, 284 N.C. 427, 201 S.E. 2d 840 (1974).

The defendant's contention that the trial judge should have instructed the jury on attempted second degree sexual offense is totally without merit. No evidence was offered of an unsuccessful attempt to commit a sexual offense, and the trial judge properly denied the defendant's request for an instruction on an offense not supported by the evidence.

[12]  In regard to the trial judge's refusal to submit to the jury the lesser-included offenses of second degree sexual offense and attempted second degree rape, the defendant contends that the jury could have found that any serious injury to the victim occurred after the attempted rape and the sexual offense were complete and that the infliction of serious injury was sufficiently separate from the rape and sexual offense to be a totally separate episode, not usable to enhance those offenses from second degree to first degree.

N.C.G.S. § 14-27.2 (Supp. 1985) provides:

（a) A person is guilty of rape in the first degree if the person engages in vaginal intercourse:

. . . .

(2) With another person by force and against the will of the other person, and:

a. Employs or displays a dangerous or deadly weapon . . ., or

b. Inflicts serious personal injury upon the victim or another person . . . .

A sexual offense under N.C.G.S. § 14-27.4 likewise is enhanced to first degree upon a finding that in addition to engaging in a forcible sexual act, defined in N.C.G.S. § 14-27.1(4) (1981) as "cunnilingus, fellatio, analingus, or anal intercourse," the defendant employed or displayed a dangerous or deadly weapon *or* inflicted serious personal injury upon the victim or another person.

Even if we agreed with the defendant's attempt to construe the statute to require the infliction of serious personal injury concomitant with the rape or sexual offense, which we do not, the defendant's contention would still lack merit, for the uncontradicted evidence was that the defendant pulled out a knife and placed it at the victim's throat in the living room, used the knife to force her into the bedroom where the offenses occurred and had the knife out when he forced her down on the bed. She stated that she "knew he had the knife" and "was afraid for [her] life."

The trial judge did not allow the jury to consider the infliction of serious personal injury as the element necessary for first degree sexual offense or attempted first degree rape; he instructed them only on the element that "the defendant displayed a dangerous weapon." No evidence was offered which suggested that the defendant did not display the knife prior to both offenses. The evidence would not have justified submission either of second degree sexual offense or attempted second degree rape.

We note that no objection was made at trial to the peremptory instructions regarding the existence of a deadly weapon and of serious injury. The defendant has therefore waived his right to appellate review of the instructions (N.C. R. App. P. 10(b)(2)) unless the trial court committed "plain error" (*State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983)). The defendant does not rely in his brief upon plain error and in fact makes no argument other than the citation to *Carter* and the statement that "the law is well-settled that the trial judge may not express an opinion based on his own view in the presence of the jury." The instructions took from the jury and determined as a matter of law the issues of whether the weapon as described constituted a deadly weapon and whether the injury as described constituted serious bodily injury.

[13] As to the contention that the trial judge committed reversible error in taking from the jury the question of whether a knife (described as being a large knife with a long shiny blade) which was capable of cutting a person's throat, going into the windpipe and going four inches into the stomach was a deadly weapon, we find that not only has the defendant shown no "plain error," he has shown no error at all. *See State v. Torain*, 316 N.C. 111, 340

S.E. 2d 465 (1986) and cases cited therein where this Court rejected a similar contention.

**[14]**   On the other hand, the question of whether the trial court may properly determine that an injury constitutes "serious bodily injury" as a matter of law has not been settled by this Court. *Compare State v. Joyner*, 295 N.C. 55, 65, 243 S.E. 2d 367, 374 (1978) ("whether serious injury has been inflicted must be determined according to the particular facts of each case and is a question which the jury must decide under proper instructions") *with State v. Pettiford*, 60 N.C. App. 92, 97, 298 S.E. 2d 389, 392 (1982) ("We believe the better rule is that where, as here, the evidence is not conflicting and is such that reasonable minds could not differ as to the serious nature of the injuries inflicted, the issue may properly be resolved by the Court by a peremptory instruction.").

However, even if the trial judge's instruction was error, it did not amount to plain error. As this Court said in *Odom*: "In deciding whether a defect in the jury instruction constitutes 'plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt." 307 N.C. at 661, 300 S.E. 2d at 378-79.

In the instant case the employee of the Guilford County Emergency Medical Services who administered treatment to the victim at the scene described her injuries as follows:

> She had a stab wound to her throat . . . To the middle of her throat, just above her chest . . . . And she also had a large laceration to her abdomen, with her intestines exposed. . . . She had no blood pressure that we could find.

Timothy D. Blair, a Greensboro Police Officer, described the wounds he observed as follows:

> The first thing I saw was a wound, or laceration to the throat, appeared to be about three inches in length.
>
>      . . . .
>
> And there was another wound to the lower, right part of her abdomen. And this was a large wound. And her internal organs were, a football-size amount, were exposed and laying [sic] outside.

The physician who was called to the emergency room and treated the victim stated:

> I saw a young woman in shock, with intestines hanging out, unable to breath [sic], with blood all over the place; and realized that this lady was in severe distress.
>
> . . . .
>
> The wound in the abdomen was approximately four inches long, up and down direction, at the level of the belly button, right at the umbilicus.
>
> The second wound was in the neck, and seemed to be transverse in nature . . . it appeared to cut through the windpipe.
>
> . . . .
>
> We then explored the internal organs, and found three injuries . . . .
>
> The first injury was through the stomach; there was a stab wound that was completely cut through the stomach. It was about two inches to three inches in length.
>
> Beneath that, there was an incision, or laceration of the intestine; it, also, measured approximately the same magnitude.
>
> As significant injuries as these were, these were minor compared to the major injury, which was a transection, or cutting through, of the vena cava . . . . [t]he major vein that collects the blood from both legs and a portion of the bowel
>
> . . . .
>
> . . . .
>
> In addition to that, there was one more injury which was not repaired, but was noted; which was that of the sacrum, or bone.
>
> What had happened was, that whatever object had caused this injury, had gone through several things, and actually, approximately a half-inch into the bone.

Other evidence of the injuries merely amplified and corroborated this testimony. No contradictory evidence was offered.

We find that error in the instruction, if any existed, regarding the element of serious bodily injury would not have "had a probable impact on the jury's finding of guilt."

The defendant's objections to the trial judge's instructions are overruled.

IX.  *Defendant's Motion in Limine.*

The defendant contends that the trial judge erred in denying a motion *in limine* which the defendant filed on 30 April 1984 while acting *pro se.* The trial judge in fact delayed ruling on the evidentiary points presented by the motion, and most of the evidence which was the subject of the motion was never offered into evidence. To the extent that evidence which was the subject of the motion was received, this opinion addresses the question of admissibility under other assignments of error.

It is unnecessary to discuss those questions further here, and this assignment of error is overruled.

X.  *Sentencing Phase.*

Finally, the defendant contends that the trial judge erred in admitting into evidence at the sentencing hearing evidence of prior acts of the defendant and in his determination of aggravating and mitigating factors.

[15]  The defendant cites no authority and makes no argument regarding the assignment of error concerning the admission of the contested evidence other than that it was error to allow the State "to cross-examine a witness as to a pending charge against the defendant in another State for the purpose of showing bias and prejudice when she already stated that she had been the fiance [sic] of the defendant." Again, the defendant's brief is misleading. The District Attorney questioned the defendant's witness about the defendant's conduct on a previous occasion when he assaulted other people in the witness' presence and she prevented the victims from calling the police. She was not questioned about charges against him. The defendant's conduct on the prior occasion was a proper subject of inquiry at the sentencing hearing.  .

This assignment of error is without merit.

The trial judge found as an aggravating factor applicable to the charges of first degree rape and of assault with a deadly weapon with intent to kill inflicting serious bodily injury that the defendant has a prior conviction or convictions for criminal offenses punishable by more than 60 days' confinement. The defendant does not except to this finding. The trial judge further found as an aggravating factor applicable to the assault charge that the offense was especially heinous, atrocious or cruel. He found no mitigating factors applicable to either offense and imposed sentences which exceeded the presumptive sentence in both cases.

[16] The defendant argues that because serious injury is a necessary element of the offense of assault with a deadly weapon with intent to kill inflicting serious bodily injury, the finding as an aggravating factor that the offense was especially heinous, atrocious or cruel violates N.C.G.S. § 15A-1340.4(a)(1) (1983) which provides that "[e]vidence necessary to prove an element of the offense may not be used to prove any factor in aggravation." We disagree.

As we stated in *State v. Abdullah*, 309 N.C. 63, 76, 306 S.E. 2d 100, 107 (1983), construing N.C.G.S. § 15A-1340.4(a)(1):

By this language it seems clear that it is not the use of evidence which is merely "inherent in the offense" but the use of evidence *necessary to prove an element of the offense* which is proscribed. [Emphasis in original.]

If the evidence establishes that the infliction of serious injury was done in an especially heinous, atrocious or cruel manner, N.C.G.S. § 15A-1340.4(a)(1) does not prohibit the finding of that aggravating factor merely because infliction of a serious injury is an element of the offense.

As Justice Meyer said in *State v. Blackwelder*, 309 N.C. 410, 414, 306 S.E. 2d 783, 786 (1983), "the focus should be on whether the facts of the case disclose *excessive* brutality, or physical pain, psychological suffering, or dehumanizing aspects *not normally present in that offense*." [Emphasis in original.] We have in an earlier portion of this opinion set out some of the witnesses' descriptions of the injuries inflicted upon the victim. The surgeon who repaired the injuries to the victim's abdomen testified that both injuries, the one to the throat and the one to the abdomen,

State v. Kuplen

were lethal. "[T]hey were more than life-threatening, they were incompatible with life." The victim described the defendant's choking her and beating her head against the floor until she lost consciousness. When she woke up, she was lying on her back on the bed and felt "the powerful thrusts of—of what felt like somebody's fists beating my stomach; and, then, I began feeling the pain and the—and then I heard my—my intestines gurgling and breathing . . . ." When she next regained consciousness, she called the telephone operator. She described her subsequent efforts to get help as follows:

> . . . I went towards the bedroom door, it was dark. And I pulled myself up on the wall. And my bedroom door was shut; I opened it, using my left arm to hold the contents of my stomach together, and using my right arm to hold myself and slide myself towards the front door.

[17]  We find that the evidence here would support a finding of excessive brutality, psychological suffering and dehumanizing aspects not normally present in the offense of assault with a deadly weapon with intent to kill resulting in serious bodily injury. Therefore the trial judge's finding that the offense was especially heinous, atrocious or cruel is amply supported by the record.

[18]  The defendant further contends that the trial judge erred in failing to find as a mitigating factor that the defendant "has been a person of good character or has had a good reputation in the community in which he lives." N.C.G.S. § 15A-1340.4(a)(2)(m) (1983).

The defendant's first witness at the sentencing hearing, a Nautilus instructor who had known the defendant for a year and a half, testified that the defendant's character and reputation in the community were "Good, as far as I know." On cross-examination, the witness admitted that he did not know anything about the defendant's friends or activities, had associated with him at the club, and had had his hair cut by the defendant for the previous six months.

Robin Boles, defendant's ex-fiancee, a barber-stylist and licensed practical nurse who had known defendant for four and one-half years, testified for the defendant. She described his general character and reputation in the community as follows:

For what people think of him, he's a very — he's — a very good person.

. . . .

He has a zest for life; he lives for life. That's something that, in my opinion, is most important to him, as far as what he wants to do with his life, in life, of what he wants to accomplish, what goals he wants to secure.

She also said that the defendant had not been violent with her with a knife, and that he had sudden changes in his demeanor. On cross-examination, the prosecutor elicited information that the witness was present with the defendant when he assaulted his sister and niece; that he had hit her (the witness) but "[n]ot to the point of assault" and not "to the point of actually hurting me."

The defense also introduced a letter of praise from the president of the Winston-Salem Barber School.

The defendant's past criminal record consisted of 1979 convictions for forcible trespass, misdemeanor breaking and entering, eluding a law enforcement officer, and transportation of alcoholic beverages, and an early 1970s conviction of misdemeanor breaking and entering and larceny.

This evidence is not sufficient to mandate a finding that the defendant is of good character. *State v. Blackwelder*, 309 N.C. 410, 306 S.E. 2d 783; *State v. Benbow*, 309 N.C. 538, 308 S.E. 2d 647 (1983).

This assignment of error is overruled.

After a thorough review of the record, we find that the defendant received a fair trial, free of prejudicial error.

No error.