STATE v. GENTRY

[227 N.C. App. 583 (2013)]

---

STATE OF NORTH CAROLINA
v.
LUCAS GUTHRIE GENTRY

No. COA12-1017

Filed 4 June 2013

1.  **Pretrial Proceedings—motion for appointment of substitute counsel—no good cause**
    The trial court did not err in a drug case by denying defendant's motion for the appointment of substitute counsel. Although defendant expressed dissatisfaction with the performance of his assigned counsel on several occasions, he failed to establish the requisite "good cause" to appointment of substitute counsel or that his assigned counsel could not provide him with constitutionally adequate representation.

---

**2. Pretrial Proceedings—motion to continue—denial—no prejudice**

The trial court did not err in a drug case by denying defendant's motion to continue his case. Defendant failed to establish that he suffered any prejudice from the court's ruling where he failed to specifically identify how the trial court's rulings impaired his ability to prepare for trial and most, if not all, of the limitations on the ability of his trial counsel to prepare for trial appeared to have resulted from defendant's own conduct.

**3. Criminal Law—pro se defendant—knowingly and voluntarily—proper colloquy**

The trial court did not err in a drug case by allowing defendant to proceed *pro se* without making a proper determination that his decision to represent himself was knowingly and voluntarily made. Although the trial court misstated the maximum sentence to which defendant was exposed during his colloquies with defendant, the trial court adequately complied with the relevant provisions of N.C.G.S. § 15A-1242.

Appeal by defendant from judgments entered 23 February 2012 by Judge Paul C. Ridgeway in Person County Superior Court. Heard in the Court of Appeals 13 February 2013.

*Attorney General Roy Cooper, by Assistant Attorney General Sueanna P. Sumpter, for the State.*

*Charlotte Gail Blake for Defendant-appellant.*

ERVIN, Judge.

Defendant Lucas Guthrie Gentry appeals from judgments entered based upon his convictions for conspiracy to sell and deliver oxycodone, possession of oxycodone with the intent to sell or deliver, selling or delivering oxycodone, selling or delivering a controlled substance within 1000 feet of a public park, and having attained the status of an habitual felon. On appeal, Defendant argues that the trial court erred by denying his motions for the appointment of substitute counsel or, in the alternative, a continuance, and by allowing him to proceed *pro se* without making a proper determination that his decision to represent himself was knowingly and voluntarily made. After careful consideration of Defendant's challenges to the trial court's judgments in light of the

STATE v. GENTRY

[227 N.C. App. 583 (2013)]

record and the applicable law, we conclude that the trial court's judgments should remain undisturbed.

## I.  Factual Background

### A.  Substantive Facts

#### 1.  State's Evidence

In August 2011, Sergeant John Walker of the Person County Sheriff's Department was involved in a narcotics interdiction operation in which informants would purchase controlled substances from "high profile dealers" while equipped with hidden video cameras. On 8 August 2011, Sergeant Walker assigned an informant named Byron Moore to purchase drugs from Defendant, with whom Mr. Moore had been personally acquainted for about six months.

At a "pre-buy" meeting, Sergeant Walker provided Mr. Moore with currency for use in purchasing narcotics from Defendant and attached a miniaturized video camera to his shirt. During the "pre-buy" meeting, Mr. Moore received a phone call from Defendant, who offered to sell Mr. Moore ten pills at $12.00 each.

After receiving Defendant's call, Mr. Moore went to Defendant's home, which was located across the street from a public park. Sergeant Walker observed Mr. Moore arrive at Defendant's house, park his scooter, and leave on the scooter shortly thereafter. Upon returning to Sergeant Walker's location, Mr. Moore indicated that he had given the money to Defendant's wife and that Defendant had handed ten pills to him.

Once he had obtained the pills from Mr. Moore, Sergeant Walker submitted them to the State Bureau of Investigation for forensic analysis. A subsequent laboratory analysis identified the pills as Oxycodone. In addition, Sergeant Walker retrieved the video camera from Mr. Moore's person and downloaded the data stored in the camera onto a compact disk so as to create a video recording that was subsequently played for the jury.

#### 2.  Defendant's Evidence

Heather Gentry, who had been married to Defendant for eleven years, admitted that the couple lived close to a public park. On 8 August 2011, Mr. Moore telephoned her and asked to purchase some pills. Upon reviewing the video recording that had been introduced into evidence, Ms. Gentry thought that she had observed herself, rather than Defendant, taking money from Mr. Moore in exchange for pills.

## B. Procedural History

On 10 October 2011, the Person County grand jury returned bills of indictment charging Defendant with conspiracy to sell or deliver oxycodone hydrochloride, possession of oxycodone hydrochloride with intent to sell or deliver, sale of oxycodone hydrochloride, sale of oxycodone hydrochloride within 1000 feet of a public park, and having attained the status of an habitual felon. On 13 February 2012, the Person County grand jury returned superseding indictments charging Defendant with having committed the same offenses while changing the name of the controlled substance that Defendant was alleged to have possessed and sold from "oxycodone hydrochloride" to "oxycodone." On 21 December 2011 the State filed a notice informing Defendant that, in the event that he was convicted of a criminal offense, the State intended to prove as an aggravating factor that, during the ten year period prior to the commission of the offenses with which he was presently charged, he had "been found by a court of this State to be in willful violation of the conditions of probation[.]"

On 8 February 2012, Defendant's appointed counsel filed a motion seeking leave to withdraw from his representation of Defendant on the grounds that Defendant "does not believe or trust his Attorney," that Defendant "does not believe his Attorney is working in [his] best interests," and that there "are numerous disagreements between Attorney and Defendant over the handling of these cases," making it "[un]likely that Attorney and Defendant will be able to work together effectively to resolve these differences." On 17 February 2012, Judge W. Osmond Smith, III, conducted a hearing concerning this motion and denied it on the grounds that, despite the fact that Defendant and his counsel had "some disagreements," there was no indication that Defendant's appointed counsel would be unable to provide Defendant with competent legal representation.

The charges against Defendant came on for trial before the trial court and a jury at the 20 February 2012 criminal session of the Person County Superior Court. On several occasions during the trial, Defendant expressed dissatisfaction with the representation that he was receiving from his appointed counsel. At the conclusion of all the evidence, Defendant asked permission to proceed *pro se*, executed a written waiver of the right to counsel, and began representing himself. On 22 February 2012, the jury returned verdicts convicting Defendant as charged. After the jury returned its verdicts, Defendant withdrew his request to represent himself, at which point his appointed counsel resumed representing Defendant.

At the conclusion of the required separate habitual felon proceeding, the jury retired to consider the merits of the State's allegation that Defendant had attained habitual felon status. During the jury's deliberations with respect to this issue, Defendant entered into a stipulation admitting that, during the ten years prior to the date upon which the offenses of which he had been convicted had been committed, he had been found to have violated the terms and conditions of a probationary judgment. After the jury returned a verdict finding that Defendant had attained habitual felon status, the trial court conducted a sentencing hearing at which it found that Defendant had accumulated twelve prior record points and should be sentenced as a Level IV offender. Based upon these determinations, the trial court sentenced Defendant to a term of 96 to 125 months imprisonment based upon his conviction for sale of a controlled substance within 1000 feet of a public park and to a consecutive term of 96 to 125 months imprisonment based upon his convictions for sale and delivery of oxycodone, possession of oxycodone with the intent to sell or deliver, and conspiracy to sell or deliver oxycodone. In spite of Defendant's stipulation to the existence of an aggravating factor, the sentences that the trial court imposed upon Defendant were within the presumptive range. Defendant noted an appeal to this Court from the trial court's judgments.

## II. Legal Analysis

### A. Motion to Appoint Substitute Counsel

[1] In his first challenge to the trial court's judgments, Defendant argues that the trial court erred by denying his trial counsel's motions to withdraw as Defendant's counsel and for the appointment of substitute counsel on the grounds that "[assigned counsel] could not represent [Defendant] effectively because the attorney-client relationship was irretrievably broken." More specifically, Defendant contends that he and his trial counsel experienced "a complete breakdown in their communications" which prevented his assigned counsel from providing him with "effective assistance of counsel." Defendant's argument lacks merit.

"The sixth amendment of the United States Constitution, as applied to the states through the fourteenth amendment, guarantees persons accused of serious crimes the right to counsel." *State v. Pruitt*, 322 N.C. 600, 602, 369 S.E.2d 590, 592 (1988) (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963)). "However, this does not mean that the defendant is entitled to counsel of his choice or that defendant and his court-appointed counsel must have a 'meaningful attorney-client relationship.' " *State v. Kuplen*, 316 N.C. 387, 396, 343

S.E.2d 793, 798 (1986) (quoting *Morris v. Slappy,* 461 U.S. 1, 13-14, 103 S. Ct. 1610, 1617, 75 L. Ed. 2d 610, 621 (1983)). "A trial court is constitutionally required to appoint substitute counsel [only when] representation by counsel originally appointed would amount to denial of defendant's right to effective assistance of counsel," so that, "when it appears to the trial court that the original counsel is reasonably competent to present defendant's case," "denial of defendant's request to appoint substitute counsel is entirely proper." *State v. Thacker,* 301 N.C. 348, 352, 271 S.E. 2d 252, 255 (1980) (citing *United States v. Young,* 482 F. 2d 993, 995 (1973) (other citations omitted).

> To establish ineffective assistance of counsel, defendant must satisfy a two-prong test[.] . . . Under this two-prong test, the defendant must first show that counsel's performance fell below an objective standard of reasonableness as defined by professional norms. This means that defendant must show that his attorney made " 'errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.' " Second, once defendant satisfies the first prong, he must show that the error committed was so serious that a reasonable probability exists that the trial result would have been different absent the error.

*State v. Lee,* 348 N.C. 474, 491, 501 S.E.2d 334, 345 (1998) (citing *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and quoting *State v. Braswell,* 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985) (quoting *Strickland,* 466 U.S. at 687, 104 S. Ct. 2064, 80 L. Ed. 2d at 693)). "In the absence of a constitutional violation, the decision about whether appointed counsel shall be replaced is a matter solely for the discretion of the trial court." *Kuplen,* 316 N.C. at 396, 343 S.E.2d at 798 (citing *State v. Sweezy,* 291 N.C. 366, 371-72, 230 S.E. 2d 524, 529 (1976) (quoting *Young,* 482 F. 2d at 995). After carefully reviewing the transcript, we conclude that, although Defendant expressed dissatisfaction with the performance of his assigned counsel on several occasions, he failed to establish the requisite "good cause" to appointment of substitute counsel or to establish that his assigned counsel could not provide him with constitutionally adequate representation.

At the hearing conducted on 17 February 2012 before Judge Smith, Defendant's trial counsel stated that Defendant had "expressed his lack of faith and trust in me and does not believe that I have been honest with him and does not believe that I am working in his best interest." Subsequently, Defendant asked Judge Smith to appoint substitute

counsel to represent him. In seeking to persuade Judge Smith of the merits of this request, Defendant expressed concern about whether his trial counsel was "aware" that certain prior convictions might not be properly admissible to support a determination that he had attained habitual felon status, whether his trial counsel had provided him with copies of materials produced during discovery, and whether his wife could be compelled to testify against him as a condition of probation. In response, Judge Smith attempted to answer Defendant's legal questions; determined that Defendant's assigned counsel had, in fact, made discovery materials available to Defendant; and explained to Defendant that:

> The constitution does not guarantee you a lawyer of your choice. It guarantees you adequate, effective representation. You have a lawyer who is experienced and capable of handling these matters, and I have not heard anything to think legally that he's not able, not prepared, and not capable of proceeding. I am just hearing that y'all have some disagreements.

At that point, Defendant indicated that, given the "irreparable problems" that he and his assigned counsel were experiencing, he would waive the assistance of counsel and told Judge Smith that, although he had "nine [witnesses] plus [his] mother" whom he wanted to testify at trial, his counsel had "never even asked" him to identify any witnesses. After hearing these additional comments, Judge Smith informed Defendant that, although there was no legal justification for the appointment of substitute counsel, he had the option of appearing *pro se*. Upon receiving this information, Defendant stated that, while he did not want to waive his right to counsel, he and his assigned counsel "might end up getting in a tussle" and that he wanted to either "take a restraining order out" on his attorney "or put [his] hands on him." When Judge Smith asked whether these remarks indicated an intention to be disruptive, Defendant apologized.

Defendant's case was called for trial on 20 February 2012 before Judge Ridgway. Prior to the selection of the jury, Defendant's assigned counsel moved that he be allowed to withdraw as counsel or, in the alternative, that the case be continued. In support of this motion, Defendant's assigned counsel explained that Defendant did not trust him and had requested him to renew the motion for appointment of substitute counsel. In addition, Defendant's assigned counsel stated that:

> [Defendant said that] I had lied to him, and that he didn't trust me, and he also said during the context of [the 17 February] hearing, Judge, that ["]you don't talk to me

again.["] In 25 years I can never remember a time in open court where I've been threatened twice. He wanted to get his hands around my neck, and he wanted to tussle with me. . . . I'm a grandfather. I don't tussle with anybody but my grandchildren. I've never had it happen before[.] [Defendant] mentioned in that hearing that he had a list of witnesses, nine witnesses, I believe, that he wanted me to call, and . . . he indicated to me over the weekend that, "Mr. Butler, that was not true, and I just said that to make you look bad in front of all of those people."

At that point, Defendant told the trial court that he planned to file a complaint against his trial counsel with the North Carolina State Bar and that he continued to be concerned about the implications of his wife's probationary sentence and its effect on his own trial. After denying these withdrawal and continuance motions, the trial court explained to Defendant that his assigned attorney was qualified and capable of providing adequate representation and that his constitutional right to the assistance of counsel did not include a right to the appointment of an attorney of his own choosing.

On the following day, Defendant's assigned counsel renewed his withdrawal motion on the ground that Defendant did not want his services. The trial court denied the renewed withdrawal motion "for the same reasons" stated on the previous day. After several pretrial motions were addressed and the prospective members of the jury were called into the courtroom, Defendant's assigned counsel informed the trial court that Defendant wanted to "fire" him. At that point, Defendant told the trial court that he believed that he had not seen certain documents that had been produced in discovery and that his "substantial conflict" with his assigned counsel had "created irreparable communication barriers" which precluded his assigned counsel from "effectively represent[ing] [him] as required by Code of Professional Responsibility." Defendant did not, however, identify any misrepresentations allegedly made by his assigned attorney, describe any disputed issues of trial strategy, or provide any examples of his assigned counsel's allegedly deficient representation. Instead, Defendant simply expressed his dissatisfaction with his assigned counsel and with the charges that had been lodged against him. After hearing from Defendant, the trial court informed him that no continuance would be granted and asked Defendant to state "unequivocally" whether he wished to hire private counsel, represent himself, or be represented by assigned counsel. In response, Defendant elected to go to trial while represented by his assigned counsel.

Following the direct examination of Sergeant Walker, Defendant's appointed counsel informed the trial court once again that Defendant had "fired" him. At that time, Defendant explained that he did not trust his assigned attorney and stated that he wanted to represent himself. In response, the trial court began making the inquiry required by N.C. Gen. Stat. § 15A-1242. During that process, the trial court informed Defendant that, in the event that he was convicted as charged and found to have attained habitual felon status, he faced up to 740 months imprisonment, or "about sixty years." After further discussion of the length of the sentence to which Defendant was exposed, Defendant withdrew his motion and agreed to continued representation by his assigned counsel.

At the conclusion of the State's case, Defendant's trial counsel informed the trial court that Defendant wanted to call Ms. Gentry as a witness. Before Ms. Gentry testified, Defendant asked if he could "have [assigned counsel] withdraw or . . . fire him and ask that he be left on as assistant counsel?" In the course of explaining this request, Defendant said that he wanted to represent himself. When the trial court began to question him about his decision, however, Defendant changed his mind once again and informed the trial court that he did not wish to proceed *pro se.*

Once the jury instruction conference had been completed, Defendant's trial counsel informed the trial court yet again that Defendant wanted to fire him and to make his own closing argument. In response, the trial court questioned Defendant for the purpose of ascertaining whether his decision to proceed *pro se* was being made knowingly and voluntarily and, during that process, informed Defendant that, in the event that he was convicted as charged and found to have attained habitual felon status, he could receive a sentence of as long as 60 years in prison. After executing a written waiver of his right to counsel, Defendant delivered a closing argument, which was not recorded, on his own behalf. In the aftermath of the acceptance of the jury's verdict convicting him as charged, Defendant withdrew his request to represent himself and Defendant's assigned counsel began representing him again. As a result, Defendant's self-representation consisted of little more than the delivery of his own closing argument.

In seeking relief from the trial court's judgments, Defendant argues that the appointment of substitute counsel is required in the event that a defendant's assigned counsel is unable to provide effective assistance due to "a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." *Sweezy*, 291 N.C. at 372, 230 S.E.2d at 529 (quoting *United States*

*v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972), *cert. denied sub nom. Tortorello v. United States*, 410 U.S. 926, 93 S. Ct. 1357, 35 L.Ed.2d 587 (1973)). Since Defendant has not contended that his trial counsel labored under a conflict of interest, that the jury's verdict was unjust, or that the representation that he received from his trial counsel was deficient in any specific manner, the validity of Defendant's argument hinges on the strength of his "breakdown in communication" theory.

Although Defendant argues that he "informed the court of serious concerns about his discovery and information he did not believe he could obtain from his attorney, such as information about marital privilege," our review of the record fails to disclose the existence of any factual basis for Defendant's "concerns." Moreover, Defendant has completely failed to articulate any connection between these "concerns" and any specific deficiencies in the representation that he received from his assigned counsel. Finally, Defendant has not explained the basis of his alleged "conflict" with his counsel. For example, he does not describe any disagreements that they had about issues of trial strategy, assert that his assigned counsel failed to meet with him, or identify any misstatements or other misconduct on the part of his assigned counsel. As a result, Defendant appears to take the position that a "complete breakdown" in communication, standing alone, is sufficient to require the appointment of substitute counsel.

Defendant cites no authority in support of this proposition, and we know of none. On the contrary, we agree with the reasoning of the California Supreme Court, which has stated that:

> In determining whether defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result, trial courts properly recognize that if a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment[.] . . . A trial court is not required to conclude that an irreconcilable conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness.

*People v. Crandell*, 46 Cal. 3d 833, 860, 760 P.2d 423, 435-36 (1988), *cert. denied*, 490 U.S. 1037, 109 S. Ct. 1936, 104 L. Ed. 2d 408 (1989); *see also, e.g., United States v. Darwich*, 2012 U.S. Dist. LEXIS 63163

*4, *reconsideration denied*, 2012 U.S. Dist. LEXIS 156784 (E.D. Mich. 2012) (finding no abuse of discretion in the denial of a motion for the appointment of substitute counsel where the "court is persuaded that any breakdown in the relationship between Defendant and [assigned counsel] has been entirely the responsibility of defendant, whether born of obstreperousness, paranoia, calculated play-book wilfulness, or some other reason"); *Simms v. LaClair*, 769 F. Supp. 2d 116, 125-26 (W.D.N.Y. 2011) (stating that, "[a]lthough there was a breakdown in communication between [the defendant] and assigned counsel, that is insufficient to create an 'actual conflict of interest' where the tension was created solely by [the defendant's] unreasonable and unjustified hostility towards his assigned attorney"); *State v. Lippert*, 152 Idaho 884, 887-88, 276 P.3d 756, 759-60 (stating that a defendant's "lack of confidence in otherwise competent counsel is not necessarily grounds for [the appointment of] substitute counsel" and holding, given that a "defendant may not . . . manufacture good cause by abusive or uncooperative behavior," that the trial court did not err by failing to appoint substitute counsel after "consider[ing] whether [the defendant] substantially and unreasonably contributed to the communication breakdown"), *review denied*, 2012 Ida. LEXIS 134 (2012); and *State v. Thompson*, 169 Wn. App. 436, 457-58, 290 P.3d 996, 1009 (2012) (stating that the trial court was not required to appoint substitute counsel where it was "plain from the record that the [communication] breakdown was entirely one-sided" on the grounds that " 'a defendant is not entitled to demand a reassignment of counsel on the basis of a breakdown in communications where he simply refuses to cooperate with his attorneys' ") (quoting *State v. Schaller*, 143 Wn. App. 258, 271, 177 P.3d 1139, 1146 (2007), *review denied*, 164 Wn. 2d 1015, 195 P.3d 88 (2008)). Although we are not bound by these decisions, we are persuaded by the logic set out in these and similar cases that the degree to which the defendant is responsible for an alleged breakdown in communication is highly relevant to the determination of whether substitute counsel should be appointed. Moreover, "[t]o the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation.' " *People v. Smith*, 6 Cal. 4th 684, 696, 863 P.2d 192, 200 (1993) (quoting *People v. Webster*, 54 Cal. 3d 411, 436, 814 P.2d 1273, 1285 (1991), *cert. denied*, 503 U.S. 1009, 112 S. Ct. 1772, 118 L.Ed.2d 431 (1992)).

The record before us in this case reflects that Defendant repeatedly interrupted the trial for the purpose of announcing that he "didn't trust" his assigned counsel. However, Defendant never described any instances of "untrustworthy" behavior on the part of his assigned attorney. Although Defendant delayed the proceedings on several occasions

by stating that he wanted to exercise his right to represent himself, he consistently changed his mind as soon as the trial court began to question him in the manner required by N.C. Gen. Stat. § 15A-1242. In addition, Defendant made statements that could reasonably be interpreted as threats to inflict physical violence on his counsel, including warning the trial court that he "might end up" in a "tussle" with his attorney and stating that he wanted to "put [his] hands on" his assigned counsel. After initially telling Judge Smith that his assigned attorney had failed to assist him in contacting up to nine witnesses, Defendant later admitted that he had told this lie for the purpose of making his assigned counsel "look bad." Finally, Defendant told the trial court that he intended to file a complaint with the State Bar against his assigned attorney without indicating that he had any valid legal or factual basis for acting in that manner. For all of these reasons, we have no hesitation in concluding that any "breakdown" in communication between Defendant and his assigned counsel stemmed largely from Defendant's own behavior, that Defendant has failed to show that these alleged difficulties in communication resulted in a deprivation of his right to the effective assistance of counsel, and that the trial court did not err by declining to appoint substitute counsel. As a result, Defendant is not entitled to relief on the basis of his challenge to the denial of his motions for the appointment of substitute counsel.

## B. Continuance Motion

[2] Secondly, Defendant argues that the trial court committed prejudicial error by denying his continuance motion. In support of this contention, Defendant asserts that, given "the continuing, irreparable communication problems between [Defendant] and his attorney, the trial court's failure to continue this matter deprived [Defendant] of his right to effective assistance of counsel." Once again, we conclude that Defendant's argument lacks merit.

As a preliminary matter, we address the standard of review that we must use in evaluating the merits of Defendant's claim. Although Defendant acknowledges that a trial court's decision to deny a continuance motion is generally reviewed using an abuse of discretion standard, he also asserts that, "when a defendant's constitutional rights are implicated, as is the case here," this "Court reviews questions of law on a *de novo* basis." In support of this proposition, Defendant cites *State v. McFadden*, 292 N.C. 609, 234 S.E.2d 742 (1977). However, *McFadden* actually states that, "when a motion to continue is based on a constitutional right, the question presented is a reviewable question of law." *McFadden*, 292 N.C. at 611, 234 S.E.2d at 744. The continuance motion

at issue in this case did not mention and was not "based on" any alleged deprivation of a constitutional right. "[A] motion for continuance which is not based on constitutional guarantees is ordinarily addressed to the sound discretion of the trial court" and will not "be held [to be] error on appeal" in the absence of an abuse of discretion. *State v. Williams*, 304 N.C. 394, 408, 284 S.E.2d 437, 446 (1981) (citing *State v. Easterling*, 300 N.C. 594, 598-99, 268 S.E. 2d 800, 803 (1980) (other citation omitted), *cert. denied*, 456 U.S. 932, 102 S. Ct. 1985, 72 L. Ed.2d 450 (1982). As a result, we will review Defendant's challenge to the denial of his continuance motion using an abuse of discretion standard.

As Defendant correctly notes, this Court has held that

> Some of the factors considered by North Carolina courts in determining whether a trial court erred in denying a motion to continue have included (1) the diligence of the defendant in preparing for trial and requesting the continuance, (2) the detail and effort with which the defendant communicates to the court the expected evidence or testimony, (3) the materiality of the expected evidence to the defendant's case, and (4) the gravity of the harm defendant might suffer as a result of a denial of the continuance.

*State v. Barlowe*, 157 N.C. App 249, 254, 578 S.E.2d 660, 663 (citing *State v. Branch*, 306 N.C. 101, 104-06, 291 S.E.2d 653, 656-57 (1982)) (other citations omitted), *disc. review denied*, 357 N.C. 462, 586 S.E.2d 100 (2003). Similarly, N.C. Gen. Stat. § 15A-952(g) provides, in pertinent part, that, "[i]n superior or district court, the judge shall consider at least the following factors in determining whether to grant a continuance:

(1) Whether the failure to grant a continuance would be likely to result in a miscarriage of justice; [and]

(2) Whether the case taken as a whole is so unusual and so complex, due to the number of defendants or the nature of the prosecution or otherwise, that more time is needed for adequate preparation[.] . . .

A careful examination of the record reveals that this case was neither unusual nor complex; that Defendant completely failed to explain the "expected evidence or testimony" that might become available in the event that a continuance was granted; that, given Defendant's failure to provide any information concerning the nature and extent of the evidence that he hoped to obtain, "the materiality of the expected evidence to the defendant's case" cannot be meaningfully assessed; and that the

denial of the requested continuance did not result in a "miscarriage of justice."

The offenses with which Defendant was charged allegedly occurred on 8 August 2011. Counsel was appointed to represent Defendant on 13 October 2011. The case was called for trial about four months later. The case that the State presented against Defendant was relatively simple and consisted of evidence tending to show that Defendant participated in a single hand-to-hand drug transaction. The State offered the testimony of only two witnesses, one of whom was an informant and the other of whom was a law enforcement officer who supervised the informant's activities. Neither of the State's witness were impeached to any significant degree, the identity of the transferred pills as controlled substances does not appear to have been subject to any dispute, and no challenging legal issues, such as the admissibility of expert witness testimony, the competence of a witness to testify, or the suppression of evidence allegedly obtained in an unconstitutional manner, arose at trial. The only witness called on Defendant's behalf was his wife, whose testimony did not contradict the State's contention that an informant had sought to buy drugs from Defendant or Ms. Gentry on the date in question. Finally, we note that most of the interactions among the parties were recorded on a video that was presented for the jury's consideration. As a result, we conclude that four months was an adequate time for trial preparation.

At the time that this case was called for trial, Defendant's trial counsel stated that Defendant had not, after four months, provided him with the names of any potential defense witnesses. However, Defendant's trial counsel also indicated that, if Defendant produced such a list of potential witnesses, he would then need time to conduct further investigation. Defendant's trial counsel failed to provide any justification for Defendant's failure to provide him with the names of any potential witnesses, did not express any certainty that such a list of potential witnesses would be forthcoming, and did not explain the role any such witnesses would play in the defense of Defendant's case. For all of these reasons, we conclude that the mere possibility that Defendant might, at the last minute, produce a list of potential witnesses did not require the trial court to grant the requested continuance.

In addition, Defendant's trial counsel made a conclusory assertion to the effect that he had not had an adequate opportunity to prepare for trial "because of the animosity and because of conversations that we've had melt down into accusations of incriminations against me." Once again, however, Defendant's trial counsel failed to describe any specific

preparatory activities that he had been unable to undertake or complete based upon Defendant's "animosity." In addition, as we have already noted, Defendant appears to have been largely responsible for the conflicts between himself and his trial counsel. As a result, given Defendant's failure to specifically identify how the trial court's rulings impaired his ability to prepare for trial and the fact that most, if not all, of the limitations on the ability of his trial counsel to prepare for trial appear to have resulted from Defendant's own conduct, Defendant has failed to establish that he suffered any prejudice from the trial court's ruling. Thus, the trial court did not err by denying Defendant's continuance motion.

### C. Defendant's Waiver of Counsel

**[3]** Finally, Defendant argues that the trial court erred by "failing to conduct a thorough colloquy with [Defendant] and advise him of the correct maximum punishment he faced if convicted," "result[ing in a] failure to obtain [Defendant's] knowing, voluntary and intelligent waiver of his right to counsel." Although the trial court did misstate the maximum sentence to which Defendant was exposed during his colloquies with Defendant, we conclude, given the specific facts present here, that the trial court adequately complied with the relevant provisions of N.C. Gen. Stat. § 15A-1242.

As this Court has previously noted, " '[i]mplicit in defendant's constitutional right to counsel is the right to refuse the assistance of counsel and conduct his own defense.' " *State v. Love*, 131 N.C. App. 350, 354, 507 S.E.2d 577, 580 (1998) (quoting *State v. Gerald*, 304 N.C. 511, 516, 284 S.E.2d 312, 316 (1981) (other citation omitted), *aff'd* 350 N.C. 586, 516 S.E.2d 382 (1999), *cert. denied*, 528 U.S. 944, 120 S. Ct. 359, 145 L. Ed. 2d 280 (1999). "The trial court, however, must insure that constitutional and statutory standards are satisfied before allowing a criminal defendant to waive in-court representation. First, a criminal defendant's election to proceed *pro se* must be 'clearly and unequivocally' expressed. Second, the trial court must make a thorough inquiry into whether the defendant's waiver was knowingly, intelligently and voluntarily made." *State v. Watlington*, ___ N.C. App ___, ___, 716 S.E.2d 671, 675 (2011) (citing *State v. Thomas*, 331 N.C. 671, 673, 417 S.E.2d 473, 475 (1992), and quoting *State v. Carter*, 338 N.C. 569, 581, 451 S.E.2d 157, 163 (1994), *cert. denied*, 515 U.S. 1107, 115 S. Ct. 2256, 132 L. Ed. 2d 263 (1995)). "A trial court's inquiry will satisfy this constitutional requirement if conducted pursuant to N.C. [Gen. Stat.] § 15A-1242." *State v. Moore*, 362 N.C. 319, 322, 661 S.E.2d 722, 724 (2008) (citing *Thomas*, 331 N.C. at 673, 417 S.E.2d at 475) (internal citation omitted). N.C. Gen. Stat. § 15A-1242 provides that a criminal defendant may proceed *pro se* "only after the trial judge makes thorough inquiry and is satisfied that the defendant:

(1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;

(2) Understands and appreciates the consequences of this decision; and

(3) Comprehends the nature of the charges and proceedings and the range of permissible punishments.

The record in this case clearly reflects that the trial court made a substantially proper inquiry into the extent to which Defendant's waiver of counsel was knowing and voluntary. The only component of the trial court's discussion with Defendant to which Defendant takes issue is the information concerning "the range of permissible punishments" that the trial court provided. On two different occasions, the trial court informed Defendant that, in the event that he was convicted of all offenses and found to have attained habitual felon status, he could be sentenced to more than 60 years imprisonment. The first of these two occasions occurred when, after the direct examination of Sergeant Walker, Defendant stated that he wanted to represent himself. At that point, the trial court informed Defendant, among other things, that, in the event that he was convicted as charged and found to be an habitual felon, he faced up to 740 months imprisonment or "about sixty years." Following this colloquy, Defendant withdrew his request to proceed *pro se*. Similarly, after the completion of the jury instruction conference, Defendant stated that he wanted to "fire" his assigned attorney and make his own closing argument. At that point, the trial court conducted another colloquy with Defendant. In the course of that discussion, the trial court informed Defendant that, if convicted as charged and found to be an habitual felon, he could receive a sentence of up to 60 years imprisonment:

> THE COURT: Do you understand that you're charged with four offenses, and that if you are found guilty of those offenses and if you are in the second phase of this trial found to be an habitual felon, that you are facing a possible maximum sentence of up to four times 185 months which comes to 740 months as a maximum possible period of incarceration. Do you understand that?

> DEFENDANT: Yes, sir.

Although Defendant elected to proceed *pro se* during closing arguments, he withdrew his request to represent himself after the jury returned its verdicts on the issue of guilt. At that point, Defendant's

trial counsel resumed the responsibility for representing Defendant. As the jury deliberated concerning whether he had attained habitual felon status, Defendant stipulated to the existence of the aggravating factor that, during the ten years prior to the charged offenses, he had violated the terms of a previous probationary sentence. At that point, the trial court informed Defendant that he might be sentenced in the aggravated, rather than the presumptive, range, stating that:

> [W]ithout an aggravating factor, the theoretical maximum you could face for each of the underlying offenses with the habitual felon status would be 185 months. With an aggravating factor for each of the offenses, the theoretical maximum that you could face would be up to 228 months incarceration; namely, an enhancement of up to 43 months from the maximum for each of the four offenses. In other words, there are four offenses based on the habitual felony status. In the event that all four offenses will run consecutively, you could face an enhanced penalty of up to 172 months because of the additional aggravating factor. That's four times 43.

As a result, the information that the trial court provided Defendant concerning the term of imprisonment to which he was exposed upon conviction failed to take into consideration the possibility that Defendant would be sentenced in the aggravated range and understated the amount of term to which Defendant was subject to being imprisoned by 172 months.

The prior decisions of this Court concerning the extent, if any, to which a criminal defendant is entitled to relief based upon the provision of inaccurate advice concerning "the range of permissible punishments" have focused upon the trial court's failure to advise the defendant of the nature of the punishment to which he was actually exposed, *State v. Taylor*, 187 N.C. App. 291, 294, 652 S.E.2d 741, 743 (2007) (holding that the trial court failed to adequately comply with N.C. Gen. Stat. § 15A-1242 in a case in which, after "correctly inform[ing] defendant of the maximum 60-day imprisonment for a Class 2 misdemeanor," the trial court "failed to inform defendant that he also faced a maximum $1,000.00 fine for each of the charges"), or to provide more than a vague indication concerning the length of the sentence to which the defendant was exposed. *State v. Frederick*, __ N.C. App. __, __ 730 S.E.2d 275, 280-81 (2012) (holding that advising the defendant that he could "go to prison for a long, long time" and would be subjected to "a mandatory prison sentence" if convicted as charged did not constitute adequate compliance with N.C. Gen. Stat. § 15A-1242). However, we do not believe that a mistake in the number

of months which a trial judge employs during a colloquy with a defendant contemplating the assertion of his right to proceed *pro se* constitutes a *per se* violation of N.C. Gen. Stat. § 15A-1242. Instead, such a calculation error would only contravene N.C. Gen. Stat. § 15A-1242 if there was a reasonable likelihood that the defendant might have made a different decision with respect to the issue of self-representation had he or she been more accurately informed about "the range of permissible punishments."

Although the information that the trial court provided to Defendant concerning "the range of permissible punishments" was technically erroneous, we are unable to conclude that this error invalidated Defendant's otherwise knowing and voluntary waiver of counsel. Our conclusion to this effect hinges upon the fact that Defendant was thirty-five years old at the time of this trial, that a sentence of 740 months imprisonment would have resulted in Defendant's incarceration until he reached age 97, and that a sentence of 912 months would have resulted in Defendant's incarceration until he reached age 111. Although such a fourteen year difference would be sufficient, in many instances, to preclude a finding that Defendant waived his right to counsel knowingly and voluntarily as the result of a trial court's failure to comply with N.C. Gen. Stat. § 15A-1242, it does not have such an effect in this instance given that either term of imprisonment mentioned in the trial court's discussions with Defendant was, given Defendant's age, tantamount to a life sentence. Simply put, the practical effect of either sentence on Defendant would have been identical in any realistic sense. In light of this fact, we cannot conclude that there was a reasonable likelihood that Defendant's decision concerning the extent, if any, to which he wished to waive his right to the assistance of counsel and represent himself would have been materially influenced by the possibility that he would be incarcerated until age 97 rather than age 111. As a result, we conclude that Defendant's waiver of the right to counsel was, in fact, knowing and voluntary and that the trial court did not err by allowing him to represent himself.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that none of Defendant's challenges to the trial court's judgments have merit. As a result, the trial court's judgments should, and hereby do, remain undisturbed.

NO ERROR.

Judges BRYANT and ELMORE concur.